MEMORANDUM OF DECISION
Jessica T. was born on April 5, 1983. The mother of the child is Janet A., date of birth January 17, 1965; the father is Paul T., date of birth June 13, 1962. Jessica T. was committed to the Department of Children and Youth Services (DCYS), now the Department of Children and Families (DCF), as a neglected child on August 31, 1989.[2] This petition to terminate parental rights was filed by the Department on CT Page 10376-A November 18, 1991.
The termination petition alleges statutory grounds under General Statutes Section 17a-112 (b)(1) (Abandonment: respondent/father), (2) (Failure to Rehabilitate: respondent/mother), and, (3) (Acts of Commission or Omission: respondent/mother).
NOTICE AND JURISDICTION
The petition shows respondent/mother residing at a specified address; the return of service annexed to the petition indicates that the mother was served in hand at the said address.
The named father is shown on the petition as last known of East Hartford; pursuant to this court's order of notice, legal publication was placed in the Hartford Courant.[3]
The petition indicates that respondent/mother is of Native American descent: Athabascan (Alaskan); accordingly, CT Page 10376-B Jessica T. is an "Indian child" and the federal Indian Child Welfare Act (ICWA), 25 United States Code, Section 1901 et seq., pertains in this proceeding.[4] Regarding notice, the IOWA provides, as follows: "In any involuntary proceeding in a State court, where the court knows . . . that an Indian child is involved, the party seeking . . . termination of parental rights . . . shall notify the . . . Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention." 25 United States Code, Section 1912(a). In compliance with the ICWA notices were sent (with enclosed copies of pleadings) to: Village Administrator, Native Village of Tyonek, Tyonek, Alaska; and, Cook Inlet Tribal Council, Family Services Dept., Cook Inlet Region, Inc., Anchorage, Alaska.[5] As per the federal enactment, the aforesaid said notices were forwarded by registered mail, return receipts requested; the official court file contains signed green receipt cards for both of the said-mailings.
Attorneys were appointed for both the respondent/mother and the child; the petition was contested and fully litigated. CT Page 10376-C The court hereby finds that notice was provided in accordance with the requirements of law, and that this court has jurisdiction to adjudicate the instant petition.
STANDARD OF PROOF
With regard to "termination of parental rights," the term is statutorily defined as "the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent or parents so that the child is free for adoption . . . ." General Statutes 45a-707 (g). It is a judicial matter of exceptional gravity and sensitivity. Anonymous v. Norton, 166 Conn. 421,430 (1975). Termination of parental rights is the ultimate interference by the state in the parent-child relationship and, although such judicial action may be required under certain circumstances, the natural rights of the parents in their children "undeniably warrants deference and, absent a powerful countervailing interest, protection." Stanley v. Illinois, 405 U.S. 645, 651 (1972).
The constitutional guarantee of due process of law CT Page 10376-D requires that the statutory ground(s) for termination of parental rights be established by "clear and convincing" evidence; not merely a fair preponderance. Stantosky v. Kramer, 455 U.S. 75 (1982). Thus, the standard of proof as mandated by General Statutes 17a-112 (b) and Practice Book 1049 is "clear and convincing" evidence.
Termination of parental rights is in two stages: the adjudication and the disposition. The adjudicatory stage involves the issue of whether the evidence presented established, by clear and convincing evidence, the existence of one or more of the statutory grounds as of the date the petition was filed or last amended (substantively). In Re Juvenile Appeal (84-AB), 192 Conn. 254, 262 (1984); In Re Nicolina T., 9 Conn. App. 598, 602 (1987); In Re Luke G.,40 Conn. Sup. 316, 324 (1985). Only upon establishment of one or more of the statutory grounds, in accord with the mandated standard of proof, may inquiry be made regarding the ultimate best interests of the child.
The parties have agreed that the ICWA applies to this CT Page 10376-E litigation. Section 1901, of Title 25 United States Code, entitled "Congressional findings", recognizes "the special relationship between the United States and the Indian tribes . . . and the Federal responsibility to the Indian people;" it reads, in various parts, as follows:
 ". . . congress, through statutes, treaties, and the general course of dealing with Indian tribes, has assumed the responsibility for the protection and preservation of Indian tribes and their resources"
and
 "there is no resource that is more vital to the continued existence and integrity of Indians than their children and . . . the United States has a direct interest . . . in protecting Indian children who are members of or are eligible for membership in an Indian tribe"
and CT Page 10376-F
 "an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and . . . an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes . . . ."
Consistent with the aforesaid, Section 1912(f) of the federal statute mandates: "No termination of parental rights may be ordered . . . in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." Respondent/mother has filed, and relies upon, the United States Department of the Interior, Bureau of Indian Affairs, Guidelines for State Courts, Indian Child Custody Proceedings, 44 Federal Register No. 228, pages 67584 thru 67595, November 26, 1979. With reference to Section 1912(f), and "Standards of Evidence", the federal guidelines state: CT Page 10376-G
 "By imposing these standards, Congress has changed the rules of law of many states with respect to the placement of Indian children. A child may not be removed simply because there is someone else willing to raise the child who is likely to do a better job or that it would be `in the best interests of the child' for him or her to live with someone else. Neither can a . . . termination of parental rights be ordered simply based on a determination that the parents . . are `unfit parents.' It must be shown . . . that it is dangerous for the child to remain with his or her present custodians. Evidence of that must be `clear and convincing' for placements, and `beyond a reasonable doubt' for termination. (Emphasis added). 44 Federal Register No. 228, at p. 67593.
FACTUAL FINDINGS
The credible evidence presented during the orderly course CT Page 10376-H of the trial established the following facts.
A. Factual Findings As to Events Antedating the Filing of the Termination Petition
Respondent, twenty-eight years of age, grew up primarily in the Hartford area as the youngest of two children; her mother was of native Alaskan origin and her father was French Canadian.[6] She completed ten grades of formal education and received her GED in 1985. It is reported that respondent, around the age of two, moved from Connecticut to Alaska with her mother and sister, living there for approximately one year. The family returned to the Hartford/New Britain area where respondent/mother reentered local schools. Janet A. then returned to Alaska for approximately two months at age fourteen, and later for roughly three months at age sixteen.
When she was fourteen years of age, respondent/mother resided with a foster family in Connecticut. She returned to her mother's Hartford home when she was fifteen, but not long thereafter the family ceased living together.[7] Respondent CT Page 10376-I left high school, worked briefly in a fast food restaurant, and, when evicted from the Hartford apartment, went to Arizona to live with relatives. She returned to Hartford in a few months and, around that time, met the respondent/father, Paul T. Janet A. and Paul T. subsequently took up residence together and lived at various times, in a number of states including Maine, California, Alaska, and Utah. The couple had been together for roughly three years when Jessica T. was born in Connecticut in 1983. Shortly after the child's birth, they moved to California, but were again back in Connecticut when the child was approximately age seven months. At about this time, Paul T. apparently insisted on returning to California, but respondent/mother, having tired of the frequent moves, and because of the increasing turmoil in their relationship, remained in Connecticut with the baby. Respondent/father has had no significant contact with Jessica T. since that time and, as stated, his whereabouts have been, and are, unknown.
After Paul T. left Connecticut, the mother, having no place to stay with the baby, requested foster placement for Jessica in late 1983. Around that time, respondent/mother CT Page 10376-J secured employment at a discount store, met JD, and began living with him in Hartford; in early 1984, Jessica T. returned to her mother's care. Janet A. and JD were married in 1985. The family resided at a number of addresses in Hartford and in New Britain; two sons (Jessica T.'s half-brothers) were born to respondent/mother from the marriage to JD: Jos. D., d/o/b, 2/9/85; and, Jar. D., d/o/b 3/6/88. According to the mother, JD cared for Jessica a great deal while the child was very young; also, apparently two of JD's sisters were close to the family during this period: BB and AP. Additionally, Jessica A. developed and maintained, a relationship with Marie D., JD's mother, who was the paternal grandmother of Jessica's two half-siblings.
The marriage between Janet A and JD was marked by domestic violence and spousal abuse. In 1987, DCYS received reports of alcohol abuse, dreadful living conditions in the family's apartment, and at least two referrals regarding Jessica T.[8] The couple separated in May 1988, and a dissolution of the marriage was finalized in December, 1988. At some point in 1988, respondent/mother took up residence CT Page 10376-K with BA, in December 1988, a referral was received by the agency from Jessica's school nurse; the child reported that a scratch on her face resulted from disciplining by BA.[9]
In mid-January 1989, DCYS received a referral from the principal of Jessica's school regarding a mark on the child's eye; Jessica had reported that she had been hit in the eye and on the backside with a belt. Investigation revealed that respondent/mother had moved and agency workers were unable to locate the family. On March 9, 1989, the Department received an anonymous referral regarding fading bruises on the child; the family was located and Jessica stated she had been hit "awhile earlier" by her mother "with a spoon." When interviewed, respondent/mother denied striking the child, but requested that Jessica be placed in foster care. The respondent mother maintained that the child did "not care about the family," wanted everything, was "spoiled", and would not "help out" (clean her room, etc.); it was explained to mother that foster placement was utilized as a "last resort," and that, in the worker's view, the existing problems should be addressed, initially, through counseling. Although CT Page 10376-L respondent/mother reportedly agreed to contact the Manchester Community Child Guidance Clinic, she allegedly informed the agency that she did not have time to attend counseling sessions, and still wished Jessica to be placed.
In April 1989, the child reported that her mother hit her with "the thing she uses on the horses"; however, Jessica, at that time, did not have any observable marks, and she did not recall when she had last been struck. On May 12, 1989, a DCYS worker, as part of a continuing investigation, interviewed Jessica T. in the presence of a police officer, along with members of the school system. Jessica repeated that her mother had hit her with a riding crop[10] and, upon examination in the nurse's office, healing bruises were observed on the child's thighs.[11] The child stated that she was hit by her mother, not the mother's boyfriend, and that her siblings were not struck by the mother.[12] When confronted regarding the child's statement, respondent/mother denied hitting the child, stating that she had little time to devote to Jessica, because she was busy caring for the baby,[13] going to school, working, and cleaning the house; the mother continued to maintain that CT Page 10376-M the child was dreadfully "spoiled" and, by way of explanation for the bruises, stated that they might have been caused by neighborhood children throwing objects at her daughter. It was explained to the mother that the child would not be permitted to return home while the investigation continued, and respondent, reluctantly, signed a voluntary placement;[14]
however, later on 5/12/89, the mother rescinded the voluntary placement, insisting that Jessica be returned home. At that time, the DCYS worker sought, and obtained, a ninety-six hour hold. On or about May 15, 1989, the child was examined by a pediatrician who found observable linear bruises on the child's thighs and buttocks to be consistent with the statement of Jessica that she had been struck with a horse crop. On that date (5/15/89), the Department, based on the affidavits of the physician and the social worker, obtained an OTC which, following a contested hearing, was sustained on May 23, 1989.
With the request for the OTC, the agency, on May 15, 1989, filed a neglect petition; the petition alleged that Jessica was abused, in that she had non-accidental injuries, CT Page 10376-N injuries at variance with the history given, emotional maltreatment, and was subjected to cruel punishment; further, that the child was neglected, in that she had been permitted to live under conditions, circumstances, and associations injurious to her well-being. On August 1, 1989, Jessica T., by agreement of the respondent/mother, was adjudicated a neglected child ("permitted to live under conditions, circumstances injurious to her well-being in that she was inappropriately disciplined"), and the abuse allegations were dismissed, without findings and prejudice. As stated heretofore, Jessica T. was thereafter committed to the Department on August 31, 1989 (also by agreement of the mother) for the statutory eighteen month period, which commitment has been periodically extended and remains in effect.
Prior to the adjudication and commitment, the court had ordered psychological evaluations of the mother and the child (with P/C and P/C with the foster parent). The order, dated 5/23/89, requested that the psychologist, in addition to the eleven standard areas of inquiry, determine "to what extent CT Page 10376-O . . the mother's cultural ties with her Indian Tribe affect her child caretaking." Dr. Mantell conducted his evaluation on June 22, 1989; he stated in a report dated July 10, 1989, the following:
 "In the judgment of this examiner, the mother is presenting significant difficulties in her attitudes towards child rearing as well as in her particular attitudes towards this child which interfere with her ability to develop and discharge an appropriate parental relationship. There is no evidence at this time to indicate that the child rearing practices and problems of the mother are derived from her native Alaskan cultural heritage."[15]
The psychologist recommended: (1) the child be committed to DCYS to remain in the foster home; (2) respondent/mother be referred for out-patient counseling directed at her child rearing practices and attitudes;[16] and, (3) the out-patient treatment be structured to explore those child rearing practices to which the child has been exposed within the CT Page 10376-P extended family.[17]
Consistent with Dr. Mantell's findings, the court, at the August 31, 1989 dispositional hearing, set the following expectations: (1) respondent/mother to maintain contact with DCYS; (2) full cooperation with the agency; (3) visit the child as often as the agency permits; (4) cooperate with the parent-aide in the home; (5) continue in individual and family counseling (Dr. Neems); (6) cooperate with the child's therapy (Manchester Child Guidance); and, — (7) no inappropriate disciplining of the child. The CIP written expectation form was signed by the mother on 8/31/89, in the presence of her attorney; the form included the written advisement that failure to comply with the court established expectations would quite likely result in the Department's petitioning for termination of parental rights.
Shortly after an initial placement under the ninety-six hour hold, Jessica T. was placed in the R foster home, where she has remained to date. Supervised visitation was established on a weekly basis at the foster home. Janet A. CT Page 10376-Q visited generally on a regular basis at the foster home into mid-August of 1990;[18] the supervised visitations at the foster home were usually two hours in duration. The foster mother testified that the visits went well, the interaction between mother and child was favorable, the mother sometimes brought one or both of Jessica's half-brothers, and the child displayed signs of affection (hugs and kisses) toward her mother. On August 10, 1990, unsupervised home visitations (at respondent's home) were put in place;[19] under the arrangement, Jessica would spend about six hours in her mother's home during each such unsupervised visitation session. The child was consistently expressing the wish to be with her mother and brothers; accordingly, the Department, acting pursuant to its statutory mandate, was undertaking, during this period, to effectuate a reunification. On September 22, 1990, the unsupervised home visits were extended to twelve hours and, on November 17, 1990, full weekend visitation was put in place (two days and two nights).
Janet A. began psychotherapy with Dr. Robert H. Neems on or about June 29, 1989; the purpose of the therapy was "to CT Page 10376-R improve Mrs. A.'s parenting skills so that her daughter could be returned from foster care."[20] The therapy addressed several areas of the mother's parenting difficulties, including: (1) excessive use of punishment; (2) inadequate use of praise; (3) inconsistent discipline; and, (4) serious misconceptions by the mother regarding her daughter which had led to a lack of understanding of Jessica's wants and needs. In late November 1990, Dr. Neems reported that respondent/mother had made "minimal and inadequate progress" and that any return of Jessica to her mother's care would require "close supervision" by DCYS. The therapist's assessment was premised, primarily, on the mother's reluctance to acknowledge that she had mistreated Jessica, and what Dr. Neems perceived as an overly permissive parenting style on the part of the mother; in a progress report dated November 28, 1991, the psychologist wrote:
 "This assessment is based upon the writer's work with Mrs. A. over the past one and one-half years. Mrs. A. has never acknowledged her mistreatment of her daughter. She insists that her parenting of her CT Page 10376-S children is adequate despite the fact that she continues to be laid back in setting and maintaining limits, which sets up a situation where the children misbehave and Mrs. A. gets angry with them. This pattern of over-permissive parenting has been seen in the office in the way that Mrs. A. parents her youngest child, Jar. D. Repeated attempts to discuss this issue have been unsuccessful."
In November 1990, Dr. Neems indicated that there existed strong bond between respondent/mother and Jessica T., that they enjoyed seeing one another, and that the child has looked forward to increasing visitation with her mother. The psychologist maintained, however, that respondent's parenting methods allowed "too much freedom, setting the stage for subsequent disapproval, criticism, and punishment." Such circumstances, in the therapist's view, placed that child at "significant risk" of further physical abuse, and at "some risk" of depression. Accordingly, it was recommended by Dr. Neems that Jessica T remain committed to the Department for "an extended trial period" following the return of the child to the mother's home, and that both mother and daughter CT Page 10376-T continue in psychotherapy for the purpose of working on the mother's parenting skills and to assist Jessica in adjusting to the changes in her life.
Through DCYS, arrangements were made for respondent/mother to receive the services and support of a parent-aide through the North Central Coalition for Children. Parent-aide contact, and services, began on or about July 20, 1990.[21] On December 20, 1990, it was reported that respondent/mother had met with the parent-aide approximately three times each month (since 7/20/90), having missed roughly one-fourth of the appointments.[22] By December 1990, respondent had developed a good relationship with the parent-aide and, while the aide had not noticed a great deal of improvement relative to the mother's parenting skills, Janet A. had become more open in discussing her feelings, particularly regarding BA's angry outbursts, his drinking, and her own sadness about an abusive childhood; the parent-aide encouraged Janet A. to discuss those issues with Dr. Neems. In December 1990, the plan was for visits with the parent-aide to continue on a weekly basis, with the mother urged to contact NCCC if she needed additional help. The parent-aide was to remain involved with the family during the initial CT Page 10376-U reunification with Jessica.
On December 21, 1990, the child was returned to her mother's home. The reunification necessitated Jessica's transferring to a new school in the town where the mother resided with her husband, BA, and the two younger children. The evidence indicated that the child was not happy either in the new school or in her mother's home. The school nurse stated that Jessica was registered in the school during the December holiday vacation period; after she began classes, she was seen by the school nurse on several occasions and was described as a "sad, very unresponsive child." On one occasion, Jessica fell asleep and told the nurse that she did not feel well. The foster mother, who maintained some contact with Jessica during this period, testified that the child spoke of a number of babysitters, that she hated the school she was attending, and that she tried to keep her room clean, but "the boys made it a mess." The child indicated to the social worker that she helped her mother with the housework, that she swept, did dishes, and had mopped the floor; also, that she often took care of her brothers because her mother CT Page 10376-V would be talking on the phone at a next door neighbor's residence. She also told various adults that her mother "yelled at her a lot," and that at such times, she would often cry. On March 20, 1991, Jessica T. arrived at the school upset and crying, she reported to the school nurse that her mother had "yelled at her." On March 21, 1991, the child was interviewed by the DCYS social worker in the presence of the school nurse; she stated she wished to return to, and reside at, the R foster home where she would be happier. Both the school nurse and the social worker testified that the discussed prospect of Jessica's returning to the R home resulted in the child's becoming a noticeably happier and more animated little girl.
In mid-April 1991, respondent/mother requested the placement of all three of her children: Jessica T., Jos. D., and Jar. D.; at or about that time, Jessica T. was returned to the R foster home. Janet A. told the worker that she was experiencing financial difficulties, was losing her apartment, and had "no one to leave the children with while she worked a third shift job." The mother stated that she was divorcing BA CT Page 10376-W and was "overwhelmed as her children did not listen to her."[23] Jessica T. returned to the R home under the existing commitment, and her two brothers were placed by DCF under a voluntary.[24]
Following the return of Jessica T. to the R foster home, extended weekend visitations were discontinued; however, respondent/mother did visit the child approximately twelve times between April and December 1991. There were a number of scheduled visitations when the mother either did not appear at all, or called and spoke with Jessica, indicating that she could not keep the scheduled appointment.[25] On August 5, 1991, respondent visited at the foster home while the Department social worker was present; the mother refused to communicate with the worker, but spoke with the foster mother, stating: "It's up to Jessica — if she can learn to live with the family." According to the foster mother, the respondent stated she had not decided whether to sign termination consent forms, became angry, and left. She did, however, visit shortly thereafter, on August 10, at the foster home. Following an August 29 visit, Jessica revealed that her mother CT Page 10376-X had inquired of her "if she thought she could get along with the boys (her two brothers);" the child reportedly stated to her mother, "I think I'm starting to like Joey a little bit." At a September 12 visit, respondent/mother brought Jessica some clothes and sneakers.
Difficulties developed following an unsupervised visitation on October 14, 1991. After that visit, Jessica T. told her foster mother that respondent had given her a new telephone number, instructing the child not to divulge the number to either the foster parent or agency social worker. The child became upset and, according to the foster parent, went into "complete withdrawal," not responding to questions directed to her.[26] Upon discussion with the therapist, Dr. Neems, it was the psychologist's opinion that it was harmful to the child for the mother to tell her that she must keep secrets from those persons whom the child had come to trust. Dr. Neems felt, based on what had occurred, that future visits between the mother and child needed to be "highly supervised." On or about October 18, 1991, respondent/mother was advised that with respect to future visitation, she would be required CT Page 10376-Y to telephone DCF and arrange supervised visits. The testimony indicated that during the balance of the calendar year 1991, there was at least one visitation in November, and two visitations in the month of December. As stated heretofore, the instant petition was filed on November 18, 1991.
Janet A. discontinued the therapy with Dr. Neems around the end of March 1991, shortly before Jessica returned to the foster home.[27] Additionally, it appears from documentation in evidence that respondent's last contact with the parent-aide was around March 1, 1991.[28] With regard to the court established expectation that the mother not engage in any inappropriate discipline of her children, there is no evidence that Janet A. physically abused the child at any time during the protracted period of commitment, including the four month period that Jessica had returned home; similarly, there was no evidence that Janet A. was abusive of either of the two boys.[29]
With reference to maintaining contact and cooperating with DCF, it is the agency's position that over the years CT Page 10376-Z respondent was just minimally cooperative. However, the evidence indicates that for most periods during the commitment, the worker, the foster parent, and the therapist were all aware of where the mother was residing and had recurring contact with her. The mother and child visited, and communicated telephonically, on a fairly regular basis; in 1990, the mother cooperated with the social worker in the preparation and signing of a service agreement. During a time of particular turmoil in Janet A.'s domestic situation, she voluntarily placed the children. Respondent maintains that at the times she did not wish to disclose her address or telephone number, she could always be contacted through her attorney, and had so advised the social worker. The agency contends that respondent/mother was generally resistant to the efforts toward rehabilitation and reunification. It is stressed that the mother never acknowledged any mistreatment of Jessica, and that she was not diligent in attending the periodic administrative planning reviews for her daughter.[30]
Further, that on occasions, the agency was not made aware of the mother's address and telephone number, and also that at certain times, respondent refused to talk with the worker or CT Page 10376-AA to allow the worker to come to her home.[31] It is the court's view, based on all of the evidence, that while the relationship between the social worker and the mother had become quite strained, this was not a case, like so many, where the parent's whereabouts were continually unknown for long periods, where contact could not usually be made with the mother, and where cooperation was virtually non-existent. The mother, in this case, did generally maintain contact with both the child and the agency, as well as with the foster mother, and did present a plan for Jessica T. when, following the unsuccessful return home of the child in 1991, it became evident that Jessica could not reside in her mother's home, given the problems with her brothers and other difficulties.
It does not appear that respondent/father has had any significant contact whatsoever with Jessica T. since she was approximately seven months of age; it was at that time Janet A. and Paul T. separated, the father intending to return to California. Although abode service was effected on the father at the time of the filing of the neglect petition, he did not appear in that proceeding and, when this termination petition CT Page 10376-BB was filed, publication was required since his whereabouts were unknown. During the duration of the commitment Paul T. has not contacted DCF regarding the child, has not communicated at all with his daughter, her foster parent, or the social worker, and has remained whereabouts unknown.
B. Factual Events Subsequent to the Filing of the Termination Petition.
After the filing of the termination petition, respondent/mother visited with Jessica T., on a bi-weekly basis, well into calendar year 1992; recorded visitations took place on 12/12/91, 12/18/91, 1/2/92, 1/18/92, 2/6/92, 2/12/92, 3/1/92, 3/15/92, 4/5/92, and 5/9/92.
As far back as the June 22, 1989 evaluation by Dr. Mantell, the mother had mentioned the child's living in Alaska with maternal relatives.[32] Around January 2, 1992, DCF received a letter from MS, a maternal great aunt of Jessica T., expressing an interest in either adopting or obtaining the legal guardianship of Jessica T. MS resides in Anchorage and CT Page 10376-CC is a native of Tyonek Village (Athabaskan Tribe); in her correspondence with the Department, MS stated she believed it was "important for Jessica to remain in the extended family [and] to get to know here culture and heritage." Janet A. expressed her agreement in having the child placed with MS and requested that if the home of the maternal great aunt in Alaska was approved, guardianship of the child be transferred as soon as possible.
On or about January 14, 1992, DCF requested the State of Alaska (Department of Health and Social Services) to conduct an investigation of the great aunt's home through the Interstate Compact. Jessica T. initially expressed some interest in moving to Alaska, and apparently had received some correspondence from her great aunt; however, never having been to Alaska, the child understandably questioned what her life there would be like and how it would compare to what she experienced (and was experiencing) in Connecticut.[33] During the pendency of the interstate study, Jessica T. continued in therapy with Dr. Neems with the understanding that the therapist would be working with the child, the foster mother, CT Page 10376-DD and respondent to prepare Jessica for the anticipated move to Alaska.[34] On or about May 6, 1992, an Interstate Compact transmittal was received by DCF stating that representatives of the Alaska child protection agency had been unsuccessful in contacting MS;[35] thereafter, when the Cook Inlet Tribal Council social worker was contacted, it was indicated that the great aunt remained interested in taking Jessica.
On or about July 27, 1992, DCF received the Interstate Study from Alaska;[36] placement of Jessica in MS's home was not recommended by the Department of Health and Social Services, Division of Family and Youth Services, State of Alaska, based on MS's "apparent ambiguous feelings and [her companion's] refusal to be interviewed."[37]
Between June and October of 1992, respondent/mother visited with Jessica T. on three occasions.[38] During this period, there was limited contact with DCYS and the mother's precise address was unknown to the agency.[39] On August 4, 1992, the court, upon agreement of the parties, ordered a psychological update of mother and child (W/PC) to be CT Page 10376-EE performed by Dr. Mantell; the evaluation was scheduled for September 15, 1992, but mother did not appear for the appointment and never called to reschedule.[40] After reviewing the documentation furnished (including the prior evaluation report), and interviewing the child and her foster mother, the psychologist concluded that a "seriously troubled relationship" existed between the mother and the child due to "both of their personalities and the distorted attachment process between them." On the information presented, Dr. Mantell characterized the mother as a "self-perceived victim whose neglect of the child is probably a replay of her own unresolved family of origin difficulties and an unresolved sense of rejection by her own parents." The evaluator felt that child had "multiple psychological parents," but that with respect to the most appropriate of the various adults available "as potential guardians," the child "should be placed with the foster parents." Dr. Mantell, in his report, dated September 22, 1992, concluded as follows: "At this point, the appearance is that termination of parental rights [would] be in the child's best interests and that the child [would] continue to feel a need to see her mother, in which CT Page 10376-FF case an open adoption would be the preferable course." Visitation by the mother with the child continued through November 1992 and into 1993.[41]
Respondent/mother testified that she had been told by Jessica that she wished to finish school and then "come home and live with her." The mother is employed at Foxwoods and stated she had attended school, recently receiving certification as a card dealer at the casino. She has arranged to receive counseling from a therapist having background in, and familiarity with, the Native American culture and its family practices.[42]
The DCF plan is to provide the child with permanency through the adoptive process. According to the social worker, the child has stated that she would like to remain in her current school through the 1993/94 school year and wishes to live with "a nice family," visiting with her "mom once in a while." The child has some understanding of adoption, as one of the children in the foster family is an adopted child. Jessica reportedly told the DCF worker that during a recent CT Page 10376-GG visit with her mother, she was asked where she wanted to live and responded she "did not know," as she found it "difficult to answer that question to her mother." Adoption by the foster parents is not viable. The child has been registered by the Department with the Adoption Resource Exchange; the agency has indicated that due to the child's Native American heritage, preference would be given to an Indian adoptive family.[43]
C. Psychologists' Testimony
1) Dr. R. H. Neems
Dr. Neems testified that he is a psychologist licensed in the State of Connecticut. He received a Master's degree in psychology in 1974 from the University of South Carolina, and earned his Ph.D. in clinical psychology from St. Louis University in April, 1982. Dr. Neems has maintained his own professional practice since 1983, and has been associated with Hartford Hospital and the Institute of Living. He provides therapy to persons in all age ranges, but specializes CT Page 10376-HH in working with children who are in foster care, or who have been adopted.[44] Dr. Neems has no educational background, training, or specialized knowledge in the area of Native American Indian heritage or culture; accordingly, he possess no particularized knowledge or information on the Alaskan Athabascan Tribe, or its prevailing child rearing practices.
Dr. Neems began the weekly therapy sessions with Janet A., individually, in June 1989; after approximately six months, the weekly sessions continued with Jessica's joint participation. The psychologist was aware of the mother's Native American lineage from the beginning and knew that such ancestry might present an issue with respect to custody; however, it was not until some considerable time after the therapy with Janet A. was discontinued (actually, during the course of trial) that he consulted an article entitled "American Indians and Alaska Native Families: Emigrants In Their Own Homeland" (C. Attneave), which is included in a treatise entitled "Ethnicity and Family Therapy" (McGoldrich, Pearce, and Giordano).
Dr. Neems saw Janet A. as having a distorted perception CT Page 10376-II of her daughter, and responding to Jessica based upon that misperception, rather than upon a reasonable understanding of the child's actual and pressing needs. Janet A., according to the therapist, considers Jessica T. to be a "spoiled child", motivated by a desire for material things, and therefore, as having purposely manipulated her placement in foster care by untruthfully stating that she had been hit by her mother with a riding crop. Dr. Neems testified: "Janet saw Jessica as being manipulative and throwing tantrums, lying about Janet's behavior towards her in order to achieve the ends that she wanted." The mother's misperception of this child was addressed, at length, in the therapy sessions, the psychologist undertaking to help the mother understand that her daughter was a "scared, very needy" little girl who was "suffering from a lack of appropriate kinds of attention." The mother's misperception was, in Dr. Neems' view, the result of her own problematic childhood and family background: that of a severely neglected child, with an alcoholic mother, a father who abandoned the family, and one left to grow up in extraordinarily difficult circumstances where she was basically responsible for raising herself. Dr. Neems CT Page 10376-JJ testified.
 "Janet has lacked the ability to understand what Jessica's needs are, and to understand what Jessica feels, and to respond appropriately. And in my . . . view, that's most likely caused by her own very severe experiences of being neglected as a child . . . Jessica has coped . . . in a fashion a . . . bit similar to Janet by finding other people who could supply some of her needs and she's formed attachments with a number of other people within her family, and then subsequently in foster care . . . much of Jessica's behavior [is] attributable to the lack of Janet's ability to appropriately meet her needs in terms of appropriate discipline and understanding, and responding to Jessica's needs."
In therapeutically addressing the problematical mother/daughter relationship, Dr. Neems stressed the need to praise the child; he testified:
"I felt that Janet's praising Jessica was critical CT Page 10376-KK to interrupt some of the negative spiral which occurred between them . . where Jessica would feel sad and neglected, and would act up some, and then Janet would respond by punishing her . . shouting at her . . and hitting her. And I felt like it was one thing to teach [the mother] appropriate discipline, but . . Jessica's needs, and the needs of the interaction between the two of them, dictated that Janet really needed to praise her daughter."
The therapist felt respondent/mother, over the course of the therapy, made "very slight progress . . . in terms of being able to praise" her daughter. During this period of time, however, Jessica's own emotional condition "improved greatly," to some extent as a result of the therapy, but primarily due to the "high quality" foster placement which had provided an environment adequately meeting the child's emotional needs. Jessica T., over time, became far less depressed, and her self-esteem improved substantially.
Dr. Neems agreed with Dr. Mantell that Jessica has a CT Page 10376-LL strong interest in maintaining a continuing relationship with her mother.[45] While the child wants to maintain a relationship with her mother, and that is important to her, she has a reasonably clear sense, particularly after the 1990/91 four month experience, that it is unlikely she could reside, on a regular basis, with Janet A.[46] With regard to a "psychological parent," Dr. Neems observed that Jessica "always lived in an environment of multiple caretakers"; he testified:
 ". . . her experience of living in foster care and being attached to her foster parents, while maintaining some wish to have a relationship with her mother, is kind of what her existence has been about . . . Jessica does want to have a relationship with her mother, but she knows that it didn't work when she tried to live there and she knows that she can't count on it working in the future. In her own mind, if she could stay in foster care forever, she would be quite happy to do that."
It is Dr. Neems' view that respondent/mother still is not CT Page 10376-MM in a position to be the child's primary caretaker, and he would not recommend that Jessica be returned to her mother's home: "I think that by continuing to blame the child for all the problems . . . [Janet] shows her continued lack of empathy and understanding for her child's feelings and needs."[47] The psychologist stated that if the child were returned to her mother, he felt there would be "a very serious risk" of further emotional harm to Jessica.[48] With respect to long term foster care versus termination of parental rights, Dr. Neems expressed the view that Jessica T.'s "primary need now is for permanency", and therefore, "there's a very strong argument that the appropriate step is to terminate."[49] The psychologist spoke to Jessica about what adoption means and of finding a family in which she could grow up; the child clearly stated that she would be sad "if she could never see her mother, and expressed the preference to have a home situation where she could live permanently, comfortably and happily, but where she could also maintain a relationship with, and a connection to, her mother. Nevertheless, as between long term foster care and a termination of parental rights quite probably involving no future contact with respondent/mother, CT Page 10376-NN the psychologist testified he would still recommend the latter: "I agree . . [no future contact with biological mother] would be unfortunate, but permanency and security and stability are what Jessica dramatically needs."[50]
In his November 1990 progress report, Dr. Neems referred to the "strong bond" between mother and daughter; and, in the August 1992 report, the therapist referred to Jessica's "wish to remain in close contact with her mother." In 1992, it was the therapist's recommendation that the child retain a visiting relationship with the mother. In his reports and in his testimony, Dr. Neems has stressed the need for security and permanency, and has observed that Jessica has done well in foster care; the therapist stated: "[i]t is clear that she has fared better than most children in foster care."
Dr. Neems considers respondent/mother "to laid back in setting and maintaining limits", and employing parenting methods that allow "too much freedom." He acknowledged that he had not consulted the McGoldrich treatise until time of trial; after reviewing the relevant content of that work, the CT Page 10376-OO psychologist agreed that a "hands-off" parenting style is "culturally normative" among Native Americans:
 "[Native American] parents have [a] norm for noninterference which means that there is a strong value placed on letting the child's innate individuality emerge. The parent may teach appropriate behavior but allows much more inappropriate behavior on the theory that natural consequences will modify behavior. Shaming and ridicule are also used."
Dr. Neems believes that the Attneave article, contained in McGoldrich's "Ethnicity And Family Therapy", suggests that certain aspects of respondent/mother's parenting conduct "may be culturally normative."
(2) Dr. D. M. Mantell
Dr. Mantell has testified as an expert on numerous occasions before this court and his outstanding qualifications CT Page 10376-PP as an experienced psychologist are well known in this jurisdiction. The witness received his Masters Degree in 1963, his Ph.D. in 1972, is a licensed psychologist in Connecticut, and has been practicing here for approximately twenty years. In this case, he was qualified by the court as an expert in the field of child and family psychology, with special emphasis in the area of child neglect and abuse. Dr. Mantell acknowledges that he is not an expert in Native American and/or Athabascan Indian culture, as such relates to therapy, although he has done extensive reading respecting the relationship between ethnicity and the effective provision of psychological therapy.
Dr. Mantell testified he is familiar with the McGoldrich book, "Ethnicity And Family Practice," considers it a "very important textbook in the field," and has "returned" to the treatise several times during the course of his practice in order to "read up" on specific cultures.[51] With regard to Chapter Three of the treatise (Attneave's "American Indians and Native Alaska Families . . ."), the psychologist testified that he read and studied it thoroughly on three occasions; CT Page 10376-QQ however, each such occasion was in preparation for this trial, in connection with his testimony, and some time after his evaluations had been conducted.[52]
In 1989, Dr. Mantell had recommended that Jessica T. remain in foster care, under commitment to DCYS, with the provision of appropriate mental health services to both mother and daughter; in 1992, the psychologist recommended, as he did at trial, that respondent's parental rights be terminated and the child be freed for adoption. He felt that the problems which had led to Jessica's initial placement had not been rectified, and that such circumstance did not result from any deficiency in the therapy provided by Dr. Neems, but from the mother's own inability to confront and effectively address her parenting inadequacies. The psychologist felt there should be an open adoption with continuing contact between mother and child, to the extent it was determined that such contact would not be harmful to the child. He viewed Jessica as "extremely vulnerable" to the formation of unrealistic wishes and beliefs in the relationship with her mother and, therefore, felt much caution and thought should go into the question of how any CT Page 10376-RR time between the child and the mother would be framed and supervised. If contact between mother and child was not closely monitored, the expert believed the child's behavior, particularly as she proceeds into the teenage years, might well become out of control, exaggerated, extreme, and exceedingly problematic.[53] In recommending termination of parental rights, Dr. Mantell considered, in addition to the child's current best interests, the protracted time period respondent was actively involved in therapy with Dr. Neems (a period of almost two years) and respondent's lack of positive response to that. Dr. Mantell concluded, as did Dr. Neems, that it seems unlikely Janet A., within a reasonable time, will rehabilitate herself to the degree where she might parent, or serve as the primary caretaker for, Jessica T.
Dr. Mantell does not believe that Janet A.'s mental health and/or parenting problems are rooted in her Native American ancestry. The psychologist did not view the mother's parenting practices as "noninterference" in the same sense as that referred to in Chapter Three of the McGoldrich treatise;[54] instead, he saw this mother's parenting style as CT Page 10376-SS having developed into a "nonrelationship", that is, an "inability of the mother and child to relate to one another." Such circumstance is not, according to this psychologist, explicable by any significant cultural identification, since the mother, by her own admission (1989 evaluation), had no knowledge of her Native American culture, and was raised in a home devoid of any such customs, and/or practices. Dr. Mantell, who is not an expert in Native American culture and/or parenting customs, does not believe that Janet A.'s inability to show significant progress in the therapy with Dr. Neems' was attributable to the latter's lack of expertise or knowledge of the Native Alaskan culture; Dr. Mantell testified: "I don't think it was relevant in any way, shape, or form . . . Janet A.] is [in the category of] those who no longer practice their Native American culture because they've been assimilated." In the psychologist's opinion, nothing was uncovered which suggested that some different or special form of therapy should have been employed merely because the mother was of Native American descent.
When Dr. Mantell first saw respondent/mother, she did not CT Page 10376-TT think that she needed therapy, did not feel that she had been abusive or neglectful, and would not acknowledge that she had any personal problems which required professional attention; he testified: "I have no reason to think that there is some form of treatment that might be made available to [the mother] now that could so quickly rehabilitate her in the sense of being a parent to this child, that it ought to be tried and the child should be caused to wait to see how it works out." In the psychologist's opinion, the most relevant treatment was tried in Dr. Neems' office and was not successful, he testified:
 "The only guide that I have currently is the report from Dr. Neems and I thought it was responsive . . . and indicated that the mother was not able to overcome the deficiencies of her own personality and childhood [and] was not able to address the difficulties between herself and her daughter. I don't know of any other form of treatment [other] than the one that was tried that would be specific to the problem at hand." CT Page 10376-UU
When asked if anything more could be done by the mother (in terms of counseling) to permit the return of the child to her care Dr. Mantell responded, "I don't know of anything."
With respect to Jessica, this psychologist felt the child resorted to a degree of fantasy regarding her mother and other family figures. The child would suggest to the psychologist that there existed "a sense of primacy" in regard to the relationship between herself and her mother. The foster mother explained that Jessica would borrow from true experiences in foster care, and then claim that she had those same experiences with her mother. Dr. Mantell described this as a common pattern, referred to as "compensatory fantasy production," seen in children having a history of neglect, but who retain a strong sense of internal attachment to the parent figure. Such children, Dr. Mantell stated, over value the sporadic, positive contacts they have with the biological parent, and deny the negative contacts and disappointments; the children develop fantasy relationships with the natural parent(s) constructing their fantasies from their experiences, CT Page 10376-VV their desires, and their relationships with other persons. In the psychologist's view, such fantasizing is "inherently pathological" and, due to repeated disappointments and uncertainty, is emotionally damaging to Jessica. Since long term therapy has been generally ineffective,[55] and the return of the child to the mother's care previously failed, the remaining alternative, consistent with the overall best interests of this child, is termination of the mother's parental rights and the placement of Jessica T. in a permanent adoptive home. As Dr. Mantell did not interview respondent during the 1992 evaluation, this recommendation is based, to "a substantial extent," on the 1989 meeting with the mother, the progress reports of Dr. Neems, and the 1992 meeting with the child and her foster parent. When asked if the choice became that of long term foster placement, or no future contact by the child with her mother through a permanent plan, Dr. Mantell replied: "I think it would be more damaging for Jessica to be left in long term foster care."[56]
ADJUDICATION
General Statutes Section 17a-112 (b) sets forth CT Page 10376-WW alternative grounds for termination of parental rights. In order to grant a petition to terminate, the court must determine that an alleged ground has been established by clear and convincing evidence. As stated previously, the "clear and convincing" burden of proof is constitutionally mandated. Santosky v. Kramer, supra. This evidentiary requirement necessitates a standard of proof that is between the standard required in an ordinary civil action and that required to find guilt; there must be "more than average certainty on the part of the fact finder." In Re Juvenile Appeal (84-3), 189 Conn. 276,297 (1983); Dacey v. Connecticut Bar Assn., 170 Conn. 520,536-37 (1976); In Re Juvenile Appeal, 1 Conn. App. 463,467-68 (1984). To those aspects of the case to which the ICWA pertains, the burden of proof, resting on the petitioner, is proof beyond a reasonable doubt. Title 25 United States Code, Section 1912(f). As the BIA guidelines for the implementation of the federal Act indicate, it is insufficient to show merely that a parent is "unfit;" rather, for a termination it must be established, "beyond a reasonable doubt," that failure to grant the petition will subject the child to serious danger. Vol. 44 Federal Register No. 228, 11/26/79, p. 67592-93. CT Page 10376-XX Under federal precedent, "proof beyond a reasonable doubt" has been described as "`proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it in the most important of his own affairs.'" United States v. Delibac, 925 F.2d 610, 614 (2d Cir. 1991). The standard imposes a substantially greater burden than proof by clear and convincing evidence,[57] although it does not require proof to an absolute certainty.[58] cf. State v. Ryerson, 201 Conn. 333,342-43, fn. 2 (1986); State v. Wright, 9 Conn. App. 275,277-78 (1986); State v. Webb, 8 Conn. App. 620, 629-31
(1986).
As stated, this termination petition was filed November 18, 1991. The court's adjudicatory consideration is limited to those events preceding the filing date. In re Romance M., infra at p. 859. Circumstances subsequent to the filing date may be considered only with reference to an appropriate disposition, consistent with the best interests of the child, following an adjudication. Id. It has been observed that under existing Connecticut law, "the determination of the child's best interests comes into play only after [a] CT Page 10376-YY statutory [ground] for termination of parental rights [has] been established by clear and convincing evidence." (Emphasis in original). In re Valerie D., 223 Conn. 492, 511 (1992); In re Kelly S., 29 Conn. App. 600, 617-18 (1992); also: In re Romance M., 30 Conn. App. 839 (1993).
A. Abandonment: Respondent/Father.
General Statutes Section 17a-112 (b)(1) provides: "The superior court upon notice and hearing may grant . . . [a termination] petition if it finds upon clear and convincing evidence, that . . . termination is in the best interests of the child and that with respect to any nonconsenting parent, over an extended period of time, which shall not be less than one year . . . [t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child . . ."
Statutory abandonment focuses on the parent's conduct, it is a question of fact to be resolved by the trial court, in CT Page 10376-ZZ the light of the relevant circumstances. The test for factually determining statutory abandonment is not limited to simply whether the parent has shown some minimal interest in the child. In Re Juvenile Appeal (Docket No. 9489), 183 Conn. 11,14-15 (1981); In Re Rayna M., 13 Conn. App. 23, 36 (1987); In Re Adoption of Webb, 14 Wash. 651, 657 (1975). Statutory abandonment differs from the concept of abandonment in the common-law sense in that it does not require proof of an intention to abandon totally or permanently. In Re Shannon S., 41 Conn. Sup. 145, 151 (1989). "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of a child." In Re Migdalia M., 6 Conn. App. 194, 208-09 (1986). In the In Re Migdalia M. decision, the Appellate court stated that statutory abandonment occurs where "a parent fails to visit a child, fails to display love and affection for the child, has no personal interaction with the child, and no concern for the child's welfare." Id. at p. 209.
Section 17a-112 (b)(1) refers to a parent's failure "to CT Page 10376-AAA maintain" a reasonable degree of interest, concern or responsibility regarding the child's welfare. Thus, that statute does not contemplate a sporadic showing of the indicia of "interest, concern or responsibility for the welfare of the child," but rather, the term "maintain implies a continuing, reasonable degree of concern." In Re Rayna M., supra; In Re Migdalia M., supra. The standard respecting statutory abandonment is "not whether the parents have shown some interest in their children," but rather, "[c]ommon sense dictates that a parent's obligations toward . . . [a] child go further than a minimal interest." (Emphasis in original). In Re Rayna M., supra. Furthermore, it is noted that "interest" alone is not the criterion for the determination of statutory abandonment; the statute refers to interest, concern or responsibility regarding the child's welfare.
Respondent/father has had no contact with Jessica T. since the child was approximately seven months old. His whereabouts have been unknown, he has never contacted DCF or the foster parent regarding his daughter, he has had no contact or communication whatsoever with the child during her CT Page 10376-BBB years of placement, and he has not participated at all in this proceeding. With respect to the father, Paul T., petitioner has met a clear and convincing evidence burden (as well as a proof beyond a reasonable doubt burden) of establishing the ground of statutory abandonment.
The court hereby finds, applying a clear and convincing standard of proof (as well as proof beyond a reasonable doubt), that petitioner has established statutory abandonment as a ground for the termination of the parental rights of Paul T. to the child, Jessica T., that is, that Jessica T. has been abandoned by respondent/father in that he has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the said child. The court also finds, applying the same required standards of proof, that said ground has existed for a period of not less than one year preceding the filing date.
B. Failure to Rehabilitate: Respondent/Mother
General Statutes Section 17a-112 (b) provides as CT Page 10376-CCC follows: "The superior court upon hearing and notice may grant [a termination] petition if it finds, upon clear and convincing evidence, that termination is in the best interests of the child and that with respect to a non-consenting parent, over an extended period of time, which . . . shall not be less than one year . . . the parents of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child . . . ."
The term "personal rehabilitation" refers to the restoration of a parent to his or her former constructive and useful role as a parent. In re Rayne M., 13 Conn. App. 23, 32
(1987); In re Migdalia M., 6 Conn. App. 194, 203 (1986). Under the statute, the court must "analyze the respondent's rehabilitative status as it relates to the needs of the particular child, and further, [determine] that such rehabilitation must be foreseeable `within a reasonable CT Page 10376-DDD time.'" In re Luis C., 210 Conn. 157, 167 (1989); In re Joshua Z., 26 Conn. App. 58, 644 (1991). Under Section 17a-112
(b)(2), the court is to consider the age and needs of the child with respect to whether the parent could, within a reasonable time, assume a responsible position in the life of the child. cf. In re Migdalia M., supra at p. 199. A "responsible position" in the life of the child is not necessarily equivalent to a full time caretaker; In re Migdalia M., supra at p. 206; and, it is not statutorily required that the parent become capable of assuming full responsibility for the child without provision of available support programs. Id. at p. 203. Our Appellate Court has stated that a trial court must consider the six factors enumerated in Section 17a-112 (d) in determining whether a parent has failed to rehabilitate. In re Michael M, 29 Conn. App. 371,377 (1989); In re Shavoughn K., 13 Conn. App. 91, 98
(1987).
Jessica T. was originally committed as a neglected child; although the actual abuse allegations were dismissed at the time of the adjudication, the neglect finding was premised on CT Page 10376-EEE the child's having been subjected to inappropriate discipline. The expectations which were established at the dispositional hearing were formulated to address the circumstances which constituted the basis for the finding of neglect; that is, inappropriate physical discipline. The evidence established that Janet A. substantially complied with the court imposed expectations. While the level of cooperation with DCF was certainly not optimum, the mother generally stayed in contact with the worker and did what she was being asked to do: visit the child, attend counseling with Dr. Neems, meet with the parent-aide, etc. Although there were some periods where the agency was unaware of the mother's exact address, during most (if not, all) of the commitment preceding the TPR filing, the mother's whereabouts were in fact known; in 1990, there were overnight visitations, thereafter the visitations were expanded with agency approval to extended weekend visitations, and in April 1991, the child, still committed, was placed back in the mother's home. Following the child's return to foster care, there was communication regarding the mother's plan that the child reside with the maternal relative in Alaska. This is not a case where the mother's whereabouts were unknown to CT Page 10376-FFF the agency for any protracted period prior to the filing; when the mother was, at one point, reluctant to disclose her address (around the time of an unrelated criminal investigation), she informed the agency (and the court) that she could be reached through her attorney. Furthermore, simply because the relationship between the worker and the parent became strained over time, and/or the mother, on isolated occasions, refused to discuss a plan or a consent termination with the agency representative, does not, in the light of all that occurred prior to the filing, amount to noncompliance with the cooperation expectation set by the court.
With regard to the remaining expectations, there was, as stated, substantial compliance. As to visitation, the mother visited at the foster home, visits were expanded to overnight at the mother's home, and later to extended weekend visits; after the return of the child to foster care, respondent continued to visit and although there were missed visitations which were disappointing to Jessica, the strong bond between mother and child continued. Certainly, from the date of CT Page 10376-GGG commitment to the date of TPR filing, there was, for the most part, compliance with the visitation expectation. Regarding counseling, respondent/mother participated regularly in the therapy with the psychologist provided by the State for twenty-one months. While the efficacy of the counseling with Dr. Neems proved questionable, such lack of success was not attributable to any failure on the part of the mother to regularly attend the counseling sessions. And, although cooperation with the parent-aide program was marginal, a relationship with the aide was developed, and that service provider reported progress. Clear and convincing evidence was not presented to indicate that the mother failed to cooperate in the child's therapy, or, that she resorted to inappropriate or corporal discipline practices during unsupervised visitations or when the child was returned home. In the court's view, the evidence would not support a failure to rehabilitate finding predicated on non-compliance with expectations.
Clearly, fulfilling the established expectations is most important and is to be accorded substantial weight; however, CT Page 10376-HHH the meeting of the expectations is not, of itself, necessarily the dispositive consideration regarding a failure to rehabilitate ground. As stated by the court in In re Michael M., supra, the "ultimate question" is "whether the parent [is] more able to resume the responsibilities of parenting at the time of the filing of the termination petition than she was at the time of commitment." 29 Conn. App. at p. 126. And, of course, any resolution of that issue in the petitioner's favor must be, under state law, supported by clear and convincing evidence. As stated, the degree of personal rehabilitation must be such as would encourage the belief that within a reasonable time, considering the age and needs of the child, the mother could assume a responsible position in the child's life; the issue of what is reasonable requires a factual determination based on the circumstances of the particular case.
This child was initially placed on the basis of a factual allegation of inappropriate, physical discipline: that the mother in 1989 struck her daughter with a riding crop. The mother has substantially complied with the expectations which CT Page 10376-III were established upon the judicial finding of that neglectful conduct (inappropriate discipline). Following many months of therapy, extended visitation began in the mother's home and, eventually, the child was returned to Janet A.'s care for approximately four months. During the several home visitations (overnights, weekends, and extended weekends), and during the four months while Jessica was home in 1990/91, there was no indication of any corporal abuse or that the child was subjected to any inappropriate discipline. Thus, in terms of the original factual predicate underlying the commitment of the child to the care and custody of the agency, petitioner's evidence did not substantiate, applying a clear and convincing evidence standard, the failure to rehabilitate allegation; that is, the evidence did not prove, by the required standard, that this child would again be subjected to inappropriate physical discipline if returned to her mother's care. Under the ICWA, petitioner must prove, beyond a reasonable doubt, that the continued custody of the child by the parent would be likely to result in serious emotional or physical damage to the child.[59] (Emphasis added). Title 25 United States Code, Section 1912(f). Petition has met neither CT Page 10376-JJJ a clear and convincing standard, nor a proof beyond a reasonable doubt standard, with regard to the likelihood of any future physical damage or danger to Jessica T.; as counsel for the child has stated: "It is apparent that although physical damage was once at issue, there is no proof that such abuse has recently occurred or would likely to be a problem in the future." Brief of Attorney For Child, p. 5.
Petitioner maintains that respondent/mother failed to rehabilitate in that her parenting attitudes remain generally unaltered notwithstanding twenty-one months of continuing therapy with Dr. Neems. The mother, in the view of the therapist and the evaluator, has not acknowledge abuse of the child, is "too laid-back" in her parenting style, exhibits an inability to praise her daughter, and places blame on Jessica for any incompatibility within the family unit. Petitioner (as well as counsel for the child) urges termination of the mother's parental rights, not on the basis of recurring physical abuse, but upon likely emotional damage to the child if returned to the mother's care, or if deprived of permanency in her home situation. CT Page 10376-KKK
As stated heretofore, any current "best interests" determination "comes into play" under Connecticut law, only after a statutory ground for termination has been established by clear and convincing evidence. Notwithstanding the dispositional portions of the psychologists' testimony relating to the desirability of permanency, and the emotional consequences stemming from a deprivation thereof, the State is nevertheless required to establish, at the adjudicatory stage of the proceedings, the existence of a statutory ground for termination at the time of the filing; In re Valerie D., supra; In re Kelly S., supra; and, such ground must be established by the mandated burden of proof. Applying a clear and convincing standard, the court encounters difficulty in finding the failure to rehabilitate ground. Essentially, respondent did what was asked of her in that she regularly participated in therapy with the therapist provided by the State for the twenty-one month period preceding the return of the child to her home; the evidence was not clear and convincing that the mother failed to regularly attend the required therapy, did not cooperate with the therapist, or did CT Page 10376-LLL not take the therapy seriously. When the child was returned home, there was, as stated, no evidence of physical abuse, and no clear and convincing evidence that Jessica was subjected to any emotional abuse. Rather, the evidence fairly showed that Jessica was unhappy in her mother's home, did not particularly like her new school, was lonesome regarding members of the foster family, was confronted with difficult problems in the home apparently caused by her younger brothers, and, in time, wished to return to the foster home; viewing the evidence under the required standard, it clearly did not indicate, or even suggest, that the child was emotionally abused by the mother while home for the four month period in 1990/91.
When in her mother's care, following (or toward the end of) respondent's regular therapy with Dr. Neems, Jessica T. was unhappy; she wished to be returned to her foster parent(s). However, the evidence indicated that there remained a strong and significant bond, "connection", or relationship between mother and child (as of the adjudicatory date, and thereafter), which bond or relationship had existed prior to placement, and was maintained since 1989 (to the date CT Page 10376-MMM of filing) by the mother's continued, albeit somewhat irregular, visitation and contact with Jessica T. The testimony of the psychologists reveals, most explicitly, that the mother/daughter relationship was (and is) a complex, exceedingly troubled one, but not a relationship devoid of mutual affection and emotional attachment. Quite clearly, mother and daughter, after twenty-one months of therapy with Dr. Neems, cannot reside happily and contently in the same household. However, the statutory ground for totally and forever severing all rights of the mother to and regarding her daughter, is not the existence of an exceedingly troubled mother/child relationship, but a failure to rehabilitate between the time of commitment and the filing of the TPR; here, the basis for the original placement was inappropriate physical discipline and, as stated, the evidence reflected no such disciplinary practices, or any emotional abuse, while the child was returned to the mother's home. The unfortunate circumstance that mother and child are unable to reside together happily, following extended psychotherapy, might be viewed as a failure to rehabilitate by respondent/mother, notwithstanding the absence of any further incidents of CT Page 10376-NNN inappropriate discipline, and no showing of emotional abuse. Just as logically, however, that continuing familial incompatibility, and the mother's unmodified parenting attitudes or beliefs, might be viewed as directly attributable to the ineffectiveness, or a failure, of the state-provided therapy.
Considering the inefficacy of the therapy (acknowledged by Dr Neems in his late 1990 progress), the age and needs of the child (permanency and certainty) as testified to by the psychologists, and the strong emotional bond that existed (and continues to exist) between parent and child, the mother's Native American lineage, and the State's failure to provide, or even seriously consider, at any point prior to filing, a therapist having training in, and familiarity with, the Native American culture and parenting practices, become highly relevant on the failure to rehabilitate ground. Such is particularly true given the State's burden of establishing the ground by clear and convincing evidence. The court did not, and could not, qualify Dr. Neems or Dr. Mantell as experts having specialized training or knowledge of Native American CT Page 10376-OOO culture and/or practices, or as having any significant experience in the provision of psychotherapy to Indians. And, no other witness presented by petitioner, including the social worker, had any particularized knowledge, education, or experience respecting the delivery of social services to Native Americans.
As early as November 1990, it was reported that Dr. Neems' therapy was not effectuating the desired results in terms of a modification of the mother's parenting attitudes and beliefs; a that time, and long before, the mother's native heritage was known, but despite the inefficacy of the in place therapy, no effort was made to alter it in any manner, or to consult with any professionals knowledgeable and experienced in working with Indian families. The reason for the aforesaid was primarily the assessment of Dr. Mantell (not an expert in Native American parenting practices), in his 1989 evaluation, that respondent, having grown up in Hartford, in a home setting where Indian traditions and customs were not matters of practice, had been "assimilated" in the dominant culture[60]
and, accordingly, her parenting attitudes and/or deficiencies CT Page 10376-PPP were not (and had not been) influenced by cultural heritage. The court does not disagree entirely with Dr. Mantell's assessment, recognizing that he is an extensively experienced psychologist. Rather, it becomes a question of whether the evidence satisfies the mandated, very high standard of proof: that of clear and convincing evidence. In such context, counsel for the respondent argues, persuasively, that Janet A. was reared exclusively by one parent, her mother (the maternal grandmother), who was a full blooded Alaskan Indian.[61] The likely influence of such upbringing and heritage is, in the court's view, reinforced by evidence that much in the mother's parenting style, which the psychologist(s) considered so problematic, is described as "culturally normative" in the Attneave portion of the McGoldrich treatise; that is, what has been characterized in these proceedings as laid-back parenting, allowing too much freedom, insufficient setting and maintaining of limits, over-permissive, non-interference, resort to shame and ridicule, etc. In view of the respondent's ancestry, and the identification of parenting problems apparently recognized by experts as culturally characteristic of such heritage, it would seem to this court CT Page 10376-QQQ that serious consideration should have been given to consulting with, or affording therapy by, a professional informed and experience in counseling Native Americans; as stated, such would appear to have been especially appropriate in that the existing therapy had proved substantially ineffective, and since there existed such a strong attachment between mother and daughter.
As indicated, respondent/mother achieved a degree of rehabilitation; there was no clear and convincing evidence presented showing any inappropriate physical discipline or emotional abuse during the four month period the child had been returned home. If, as petitioner contends, a failure to rehabilitate results from the absence of any rectification of the troubled relationship between parent and child, and their inability to reside tranquilly in the same household, then, as respondent's counsel maintains, the efficacy, sufficiency, and suitability of the therapy provided, in the light of the mother's known ancestry, is certainly open to serious question. The existence of a termination ground must be established as of the filing date; the evidence indicated that CT Page 10376-RRR the child's needs are permanency and certainty, particularly in view of her age; juxtaposed to such needs is (as of filing, and thereafter) the significant, continuing bond between mother and child. Therapy has never been provided by one informed in the Native American culture or its "culturally normative" parenting practices, even when the in place therapy was not producing results in terms of an abatement of mother's assertedly inappropriate parenting attitudes and beliefs. The intervention by a psychologist trained and experienced in the delivery of therapeutic services to Indian families might well have enabled the mother to better assume a responsible position in the child's life within a reasonable time, particularly in view of the strong existing bond; as stated, a "responsible position" under the statute is not necessarily that of a full time caretaker, or the capacity to assume responsibility for the child's care without the provision of support programs. In re Migdalia M., supra. The court is unable to conclude that petitioner has established, by clear and convincing evidence, that Janet A. failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and CT Page 10376-SSS needs of her daughter, she could assume a responsible position in the child's life.[62]
As indicated, the parties have stipulated that ICWA applies in this case; thus, even if the court found the failure to rehabilitate ground, under the state statute, proved by clear and convincing evidence, a further determination would be required as to whether petitioner had established, by proof beyond a reasonable doubt, compliance with the provisions of the federal Act.
Title 25 United States Code, Section 912(f) reads: "No termination of parental rights may be ordered . . . in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the . . . custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child." (Emphasis added). The BIA Guidelines for State Courts in Indian Child Custody Proceedings provide, as follows: CT Page 10376-TTT
 "Removal of an Indian child from . . her family must be based on competent testimony from one or more experts qualified to speak specifically to the issue of whether continued custody by the [parent] . . . is likely to result in serious physical or emotional damage to the child. Persons with the following characteristics are most likely to meet the requirements for a qualified expert witness for purposes of Indian child custody proceedings:
 (i) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices.
 (ii) A lay expert witness having substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural CT Page 10376-UUU standards and childrearing practices within the Indian child's tribe.
 (iii) A professional person having substantial education and experience in the area of his or her specialty. Vol. 44 Federal Register, No. 228, page 67592.
In this case, petitioner produced no witness having "substantial experience" in the delivery of services to Indian families, or having "extensive knowledge" of Native American culture and childrearing practices. However, petitioner did produce evidence as per (iii) above, the testimony of professional persons (psychologists and social worker) having "substantial education and experience." Although Section 1912(f) does not expressly define "qualified expert witness", courts representing the preferred view have gone beyond (iii) of the BIA Guidelines and have concluded that experts qualified under the ICWA must possess expertise in, and substantial knowledge of, Native American families and their child rearing practices.[63] Matter of Welfare of M.S.S., 465 CT Page 10376-VVV N.W.2d 412, 417 (Minn.App. 1991); State Ex Rel. Juv. Dept. v. Charles, 688 P.2d 1354 (Or. Ap. 1984). In the M.S.S. case, the court stated: "The experts should also be conversant with Indian culture and child-rearing practices, lest `the problems Congress has tried to remedy may remain, despite the adoption of the [ICWA]:'" (Emphasis added). 465 N.W.2d at p. 417. And in the Charles decision, the Oregon Court, referring to the specific language of the BIA Guidelines, noted: "The `guidelines' are not rules and expressly state that they are not intended to have legislative effect [44 Fed. Reg. 67684
(1979)] . . . but we agree . . . that an expert witness within the meaning of [the ICWA] must possess special knowledge of social and cultural aspects of Indian life." 688 P.2d at p. 1359-60, fn. 3. This court accepts as perfectly sound that interpretation of the term "qualified expert witness" in Section 1912(f), as the BIA Commentary states:
 ". . . knowledge of tribal culture and childrearing practices will frequently be very valuable to the court. Determining the likelihood of future harm frequently involves predicting future behavior — CT Page 10376-WWW which is influenced to a large degree by culture. Specific behavior patterns will often need to be placed in the context of the total culture to determine whether they are likely to cause serious emotional harm." Vol. 44 Federal Register, No. 228, p. 67593.
In this case, petitioner has not presented the testimony of experts qualified under the meaning and intent of the ICWA, for that reason, and for those reasons previously articulated herein with respect to the sufficiency of the proof under the Connecticut statute, petitioner has not proved, beyond a reasonable doubt, respondent/mother's failure to rehabilitate in terms of a likelihood of serious emotional or physical damage to the child.[64]
Title 25 United States Code, section 1912(d) provides: "Any party seeking . . . termination of parental rights to . . . an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved CT Page 10376-XXX unsuccessful." Unlike Section 1912(f), this section does not specify the burden of proof resting on petitioner to establish provision of adequate rehabilitative services. However, a number of jurisdictions have concluded that Congress intended the greater standard (that of beyond a reasonable doubt) to apply to both subsection (d) and (f) of Section 1912. See: e.g. Matter of Welfare of M.S.S., supra at p. 417-418; In Re Interest of D.S.P., 458 N.W.2d 823, 829 (Wis.App. 1990); People In Interest of S.R., 323 N.W.2d 885, 887 (S.D. 1982). In the M.S.S. decision, the Minnesota Court, in discussing Section 1912(d), stated the following:
 "In enacting the ICWA, Congress indicated its intent to diminish the effect of having culturally biased government officials, who perceive the necessity of terminating parental rights of Indian citizens through quite different cultural lenses, decide whether to terminate an Indian's parental rights . . .
Logically, [it] seems compelled: If termination of CT Page 10376-YYY parental rights of Indian parents to their children can be ordered only upon a factual basis shown beyond a reasonable doubt (Sec. 1912(f)), and if termination cannot be effected without a showing of active efforts to prevent the breakup of the Indian family and a failure thereof (Sec. 1912(d)), then the adequacy of efforts and futility of them, as predicates to termination, must likewise be established beyond a reasonable doubt. Therefore, we recognize the reasonable doubt standard as appropriate in determining whether the petitioning party has complied with Section 1912(d)." 465 N.W.2d supra at p. 418.
With respect to the instant case, this court accepts the foregoing construction of Section 1912, and the recited rationale supporting it.
Respondent/mother was raised, almost exclusively, by her own mother, who was a Native Alaskan Indian. Upon placement of Jessica T., remedial services were provided to the mother consisting of therapy with Dr. Neems and a parent-aide. No CT Page 10376-ZZZ evidence was presented by petitioner that the therapy and/or services furnished by or through the Connecticut child protection agency were, in any way, designed to address, or take into consideration, the particular problems experience by Native American families. While the professionals involved were all well-educated and experienced in their fields, none had any real background in matters relating to the Native American culture and its child rearing customs. On the evidence, the court cannot conclude that petitioner proved, beyond a reasonable doubt, agency efforts to provide remedial services and rehabilitation programs designed to prevent the breakup of the Indian family; that is, petitioner has not proved, by the ICWA standard, what is required under Title 25 United States Code, section 1912(d).
The court finds that petitioner, upon an application of either of the standards of proof referred to herein (clear and convincing evidence or beyond a reasonable doubt), has not established the failure to rehabilitate ground under Connecticut General Statutes 17a-112 (b)(2) and the statutory prerequisites for termination under the ICWA, Title 25 United CT Page 10376-AAAA States Code, Section 1912(d) and (f).[65]
C. Act of Commission or Omission: Respondent/Mother
General Statutes Section 17a-112 (b)(3) states, as follows: "The superior court upon hearing and notice . . . may grant . . . [a termination] petition if it finds, upon clear and convincing evidence, that termination is in the best interest of the child and that . . . with respect to a nonconsenting parent, over an extended period of time, which . . . shall not be less than one year the child has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being."[66]
"In the adjudicatory phase of termination proceedings, the court determines the validity of the grounds alleged in the petition, and therefore is limited to events preceding the filing date of the petition." (Emphasis added). In re Romance M., supra. Thus, consideration of this alleged termination ground, as with the others, is limited to the CT Page 10376-BBBB factual events from the date of commitment to November 18, 1991. Section 17a-112 (b)(3) authorizes termination where specific acts of parental commission or omission have caused serious physical or emotional injury to the child. In re Kelly S., 29 Conn. App. 600, 614 (1992). Jessica T. has been in continuous foster care since the original 1989 placement except for extended unsupervised home visitations and the four successive month period in 1990/91 when she was returned to her mother's care. While in foster care, the child could not have been denied, by reason of parental acts, the care, custody and control necessary for her physical, educational, moral or emotional well-being. cf. In re Kelly S., supra. And, regarding the four month period the child was returned to her mother's home (as well as during the extended home-visitations), there was presented no clear and convincing evidence of any physical or emotional abuse.
It is the conclusion of the court that, in these circumstances, petitioner has not established, by the mandated standard of proof, the alleged Section 17a-112 (b)(3) ground for termination of parental rights. CT Page 10376-CCCC
DISPOSITION
General Statutes section 17a-112 (b) permits the court to grant a petition to terminate parental rights only upon a determination, based on clear and convincing proof, that to terminate would be in the best interests of the child. The best interest or dispositional decision is to be made upon the totality of the evidence (i.e., to last day of trial).
Petitioner has not established, by the required standards of proof, a statutory ground for termination of respondent/mother's parental rights. The petitioner has established, by either standard, a statutory ground as to the father, and that the said ground (abandonment) existed for a period of not less than one year preceding the filing.
On the totality of the evidence, it is clear that respondent/father has expressed no interest in this child, has apparently had no contact with her since she was approximately age seven months, has never contacted the foster, parent or DCF CT Page 10376-DDDD regarding his daughter, and his whereabouts have remained unknown throughout this trial. However, the primary purpose of terminating a biological parent's parental rights is to permit the placement of the child in the home of adoptive parents. In re Juvenile Appeal (Docket No. 10718), 188 Conn. 259,262 (1982) ("`. . . petitions for termination are presumably seldom brought unless prospective adoptive parents are available . . .'"); In re Juvenile Appeal (Anonymous),177 Conn. 648, 673 (1979). Since a termination ground has not been established with regard to respondent/mother, and therefore an adoption of this child cannot be effected, the court is unable to conclude, on the evidence, and applying the required standards of proof, that a purpose entirely consistent with the child's best interests would be served by terminating the parental rights of Paul T. A permanent separation from both natural parents through the adoptive process would afford permanency, which the psychologists (no expertise in Indian culture, etc.) testified would be in Jessica T.'s best interests; however, since an adoption cannot be perfected, no legal impediment should be imposed regarding possible future relationships with any paternal family members CT Page 10376-EEEE from which the child might benefit. The court finds that although a ground for terminating the respondent/father, s rights has existed for not less than one year, it has not been demonstrated that termination of Paul T.'s parental rights would not serve a purpose clearly consistent with the child's best interest.
CONCLUSION
For the reason stated, the petition to terminate parental rights to Jessica T. is Denied; and, the said petition maybe, and hereby is, Dismissed.[67]
Mulcahy, J. CT Page 10376-FFFF