Argued and submitted June 8, reversed September 26, reconsideration denied December 7, petition for review allowed December 18, 1984 (298 Or 427)
See 299 Or 341, 701 P2d 1053 (1985)

In the Matter of Jade Charles, a Child.

## STATE ex rel JUVENILE DEPARTMENT OF MULTNOMAH COUNTY,
*Respondent,*

*v.*

## CHARLES,
*Appellant,*

## SITKA COMMUNITY ASSOCIATION,
*Intervenor.*

(80,230; CA A29488)

688 P2d 1354

█

Patrick R. Berg, Lake Oswego, argued the cause for appellant. With him on the briefs was Buckley, Johnson, Carlson, Bolen & Berg, P.C., Lake Oswego.

Linda DeVries, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

LeRoy W. Wilder, Portland, argued the cause and filed the brief for intervenor.

Gary Forrester, Portland, filed a brief for amicus curiae, Confederated Tribes of the Umatilla Indian Reservation.

Before Gillette, Presiding Judge, Joseph, Chief Judge, and Van Hoomissen, Judge.

JOSEPH, C. J.

## JOSEPH, C. J.

This case involves an assertion of authority over an "Indian child" by a juvenile court. It requires us to interpret several provisions of the Indian Child Welfare Act, 25 USC § 901 *et seq* (ICWA). The order of disposition, among other things, declared the child to be a ward of the court. We reverse, because the state failed to make a showing that remedial efforts to prevent the breakup of the Indian family had proven unsuccessful and failed to prove by clear and convincing evidence that foster care placement of the child was necessary to prevent her from suffering serious emotional and physical damage. We discuss all the assignments of error, however, to clarify several of the act's provisions which otherwise could be troublesome in the future.

On May 5, 1983, pursuant to ORS 419.569(1)(b), the Children's Services Division took temporary physical custody of the child after a citizen had complained that her mother was abusing her. The court gave CSD temporary custody of the child in a detention hearing held the next day. A petition was filed on May 11 and an amended petition on May 24.

On June 2, apparently, the parents signed (but did not file) an affidavit of indigency. On June 13, the juvenile counselor informed the juvenile court referee that "parents wish to retain an attorney," and a pre-trial conference was set for June 22. The referee also wrote "separate attorneys authorized" on a separate document, apparently in response to the counselor's statement. The record does not indicate that any hearing was held on June 22. The parents' affidavit of indigency was filed in the juvenile court on June 29, and on that day separate counsel were appointed for the mother and the father. The hearing on foster care placement was held on July 21 and 22, and each parent was represented by counsel. At that hearing, the court continued temporary custody of the child with CSD for three weeks and directed the agency to develop a plan for reuniting the family. At the dispositional hearing the child was made a ward of court and temporarily committed to CSD for care, placement and supervision. Subsequently, CSD proposed a plan for reuniting the mother and the child as soon as adequate housing was located. The child was returned to the mother in September, 1983.

Mother argues, as does amicus Confederated Tribes of the Umatilla Indian Reservation, that the court erred, under § 1912(b) of the ICWA, by failing to appoint counsel for the parents at or before the preliminary hearing. 25 USC § 1912(b) provides:

> "In any case in which the court determines indigency, the parent or Indian custodian shall have the right to court-appointed counsel in any removal, placement, or termination proceeding. The court may, in its discretion, appoint counsel for the child upon a finding that such appointment is in the best interest of the child. Where State law makes no provision for appointment of counsel in such proceedings, the court shall promptly notify the Secretary upon appointment of counsel, and the Secretary, upon certification of the presiding judge, shall pay reasonable fees and expenses out of funds which may be appropriated pursuant to section 13 of this title."

Neither that provision, nor 25 USC § 1912(a),[1] indicates clearly at what point in the proceedings counsel must be appointed. They do, however, make the appointment of counsel dependent both on a determination that a child is an Indian and that a parent or Indian custodian is indigent. In this case, the first contact the parents had with the juvenile court was the detention hearing on May 6, at the end of which the court awarded CSD temporary custody of the child. We have searched the record in vain for any indication that the referee then knew or had reason to know that an Indian child was involved. Emergency removal under ORS 419.569 is *initially* purely a state law matter and is not subject to all of the ICWA requirements. *See* n 2, *infra.*

---

[1] 25 USC § 1912(a) provides:

"In any involuntary proceeding in the State court where the court knows or has reason to know that an Indian child is involved, the parties seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. If the identity or location of the parent or Indian custodian and the tribe cannot be determined, such notice shall be given to the Secretary in like manner, who shall 15 days after receipt to provide the requisite notice to the parent or Indian custodian and the tribe. No foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe or the Secretary: *Provided,* That the parent or Indian custodian or the tribe shall, upon request, be granted up to twenty additional days to prepare for such proceeding."

■ The record does not indicate when or where the parents obtained an affidavit of indigency form, but we infer that it was provided by the court on or after May 6 and before June 2. The parents' next contact with the court was the June 13 conference. The referee's memorandum on that date reflects the parents' wish to retain an attorney. Their affidavit of indigency was filed in the juvenile court on June 29, and on that day they were furnished separate counsel. Therefore, counsel was appointed for the parents as soon as the court had determined their indigency status, as the act requires. Counsel was appointed well in advance of the July hearing on the merits of the foster care placement, and there is no showing that the parents suffered any prejudice, even if their eligibility for appointed counsel could have been determined earlier.

Mother, intervenor and amicus all argue that the court erred by not requiring the state to show that active efforts had been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that those efforts had proved unsuccessful. 25 USC § 1912(d) provides:

> "Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."

■ The arguments of the parties indicate that there is some confusion about at what point in the proceedings the showing of unsuccessful remedial services is required. Mother and amicus contend that it is required before *removal* of a child. However, the statute states that the showing shall be made by "[a]ny party *seeking to effect* a foster care placement of, or termination of parental rights to, an Indian child." (Emphasis supplied.) The "to effect" language refers to legal proceedings required to accomplish those objectives, not to the act of taking physical custody of a child.[2] Accordingly, the

---

[2] 25 USC § 1922 provides:

"Nothing in this subchapter shall be construed to prevent the emergency removal of an Indian child who is a resident of or is domiciled on a reservation, but temporarily located off the reservation, from his parent or Indian custodian or the emergency placement of such child in a foster home or institution, under

showing required by § 1912(d) need only be made in a hearing on the merits of foster care placement or parental rights termination.

■■ The legislative history of § 1912(d) reveals Congress' intent to serve the goal of preventing the breakup of Indian families by mandating application of remedial and rehabilitative measures.

> "[§ 1912(d)] provides that a party seeking foster care placement or termination of parental rights involving an Indian child must satisfy the court that active efforts have been made to provide assistance designed to prevent the breakup of Indian families. The committee is advised that most State laws require public or private agencies involved in child placements to resort to remedial measures prior to initiating placement or termination proceedings, but that these services are rarely provided. This subsection imposes a Federal requirement in that regard with respect to Indian children and families." H.R. Rep. No. 95-1386, 95th Cong, 2d Sess 22 (1978).

The language of the provision is unequivocal: The state *"shall satisfy the court that active efforts have been made to provide remedial services."* (Emphasis supplied.) To do that, the state must show that the efforts have been made but have not worked. In the present case, the state did not make an explicit showing, but it points to testimony peppered throughout the hearing that indicates that some remedial efforts were made which were arguably unsuccessful and asks us to find on *de novo* review that the showing required by § 1912(d) was made. We cannot conclude that the diffuse evidence to which the state points amounts to the affirmative showing that Congress contemplated when it enacted § 1912(d).

---

applicable State law, in order to prevent imminent physical damage or harm to the child. The State authority, official, or agency involved shall insure that the emergency removal or placement terminates immediately when such removal or placement is no longer necessary to prevent imminent physical damage or harm to the child and shall expeditiously initiate a child custody proceeding subject to the provisions of this subchapter, transfer the child to the jurisdiction of the appropriate Indian tribe, or restore the child to the parent or Indian custodian, as may be appropriate."

Although the statute is by its terms applicable only to "an Indian child who is a resident of or is domiciled on a reservation, but temporarily located off the reservation," it is implicit that "emergency removal" authority extends to non-reservation Indian children. The legislative history bears that out. *See* H.R. 1386, 95 Cong, 2d Sess 25.

■ ■ We turn now to arguments that the state failed to prove the need for foster care placement by clear and convincing evidence. 25 USC § 1912(e) provides:

> "No foster care placement may be ordered in such a proceeding in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."

Neither the plain language nor the legislative history of the provision clarifies whether proof that continued custody of a child is likely to result in serious emotional or physical damage *requires* expert testimony. There might well be cases where the state could make such a showing by merely presenting physical evidence or lay testimony. Nonetheless, the legislative history does indicate that Congress intended "qualified expert witness" to refer to an expert with particular and significant knowledge of and sensitivity to Indian culture.[3]

---

[3] The House Report for the Indian Child Welfare Act states:

"The courts tend to rely on the testimony of social workers who often lack the training and the insights necessary to measure the emotional risk the child is running at home. In a number of cases, the AAIA [Association on American Indian Affairs] has obtained evidence from competent psychiatrists who, after examining the defendants, have been able to contradict the allegations offered by the social workers. Rejecting the notion that poverty and cultural differences constitute social depravation and psychological abuse, the Association argues that the State must prove that there is actual physical or emotional harm resulting from the acts of the parents.

"The abusive actions of social workers would largely be nullified if more judges were themselves knowledgeable about Indian life and require a sharper definition of standards of child abuse and neglect." H.R. 1386, 95 Cong, 2d Sess 10.

"Subsections (e) and (f) establish evidentiary standards for foster care placement or termination of parental rights. As introduced, H. R. 12533 required a 'beyond a reasonable doubt' standard for both actions. While the committee feels that the removal of a child from the parents is a penalty as great, if not greater, than a criminal penalty, it amended the bill to reduce the standard to 'clear and convincing' in the case of foster care where parental rights are not terminated. The phrase 'qualified expert witnesses' is meant to apply to expertise beyond the normal social worker qualifications." H.R. 1386, *supra*, at 22.

The "Guidelines for State Courts," 44 Fed Reg 67684 (1979), published by the Department of the Interior, identifies an acceptable expert witness as:

"(i) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organiza-

In the present case, two experienced social workers testified for the state in support of foster care placement. Although the state argues that both witnesses possessed "expertise beyond normal social worker qualification," neither of them possessed specialized knowledge of social or cultural aspects of Indian life. Although the state's case does not fail solely because it did not present expert testimony within the meaning of the act, we conclude that, in the light of the contrary testimony of the mother's expert,[4] the state failed to carry its burden to show by *clear and convincing evidence* that the continued custody of the child by the mother was likely to result in serious emotional or physical damage to the child. In fact, the trial court's reliance on the testimony of the state's social worker unfamiliar with Indian culture represents the very problem Congress attempted to solve with passage of the ICWA. *See* n 3, *supra.* The failure of the state to produce the kind of competent evidence that the ICWA requires necessitates reversal.

Reversed.[5]

---

tion and child-rearing practices.

"(ii) A lay expert witness having substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural standards and child raising practices within the Indian child's tribe.

"(iii) A professional person having substantial education and experience in the area of his or her specialty." 44 Fed Reg at 67593, Nov. 26, 1979.

The "guidelines" are not rules and expressly state that they are not intended to have legislative effect. 44 Fed Reg 67684 (1979). We decline to adopt the specific recommendations of the "guidelines," but we agree with the general proposition that an expert witness within the meaning of that term in 25 USC § 1912(e) must possess special knowledge of social and cultural aspects of Indian life.

[4] The mother provided the testimony of Dr. Ball, a board certified psychiatrist, who had been in private practice for 20 years and had treated Indians for at least 7 years as a consultant to the Urban Indian Council.

[5] An argument diffusely presented in the briefs and focused by counsel for the mother at oral argument is that the trial court never obtained jurisdiction over this proceeding, because it failed to comply with the ICWA. We reject that argument. Congress specifically vested tribal courts and state courts with authority over Indian child custody proceedings. 25 USC § 1911(a) and (b). If a state court, as opposed to a tribal court, properly has jurisdiction over the subject matter, the court is not divested of jurisdiction simply because it fails to comply with the act. As in this case, the trial court's failure to comply with the ICWA is subject to review. The appropriate remedy for noncompliance is reversal, remand, or both, depending on the circumstances.