**T.F., Appellant,**

v.

**STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, Division of Family & Youth Services, Appellee.**

**S.L.M., Appellant,**

v.

**State of Alaska, Department of Health & Social Services, Division of Family & Youth Services, Appellee.**

No. S–9674.

Supreme Court of Alaska.

July 20, 2001.

Bethany Spalding, Assistant Public Defender, Fairbanks, and Barbara K. Brink, Public Defender, Anchorage, for Appellant T.F.

Thomas E. Fenton, Law Office of Thomas E. Fenton, Fairbanks, for Appellant S.L.M.

Karla Taylor–Welch, Assistant Attorney General, Fairbanks, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

### OPINION

FABE, Chief Justice.

## I. INTRODUCTION

S.F. and C.F. are twin children in need of aid. Their mother suffers from a serious and long-term addiction to cocaine, and she saw the twins only once between their birth and the termination proceeding in this case. Their father was incarcerated at the time of their birth and absconded from custody shortly thereafter. In part because of his absence and in part because of delays by the State, Department of Health & Social Services, Division of Family & Youth Services (DFYS), the father's paternity was not promptly determined and DFYS did not develop a case plan for him until nearly eight months after the twins' birth. The superior court terminated the parental rights of both parents, and the parents challenge that termination. We affirm the superior court's termination of parental rights for both parents.

## II. FACTS AND PROCEEDINGS

S.F. and C.F. are Indian twins born prematurely on July 22, 1999. The twins were developmentally damaged by prenatal cocaine exposure and may also suffer from fetal alcohol syndrome. Within days of their birth, DFYS assumed emergency custody of them. Since that time, they have primarily been cared for by a foster mother. In October a court found the twins to be children in need of aid, and committed them to the temporary custody of the State. DFYS petitioned on November 15, 1999 for termination of parental rights, and in April 2000 Superior Court Judge Ralph R. Beistline terminated the rights of both parents.

S.M., the mother, acknowledges a "significant history of substance abuse and associated illegal activity"; the trial court expressed particular concerns about the likelihood of her overcoming her addiction to cocaine. S.M. used cocaine and alcohol during her pregnancy, received almost no prenatal care, and did not know she was having twins until the second baby was born. As of S.F. and C.F.'s nine-month birthday, S.M. had visited the twins once, and had missed three other scheduled visits. According to a social worker's account of S.M.'s sole visit with the twins, S.M. was afraid to be alone with the children and allowed her son to cry for ten minutes without picking him up or attempting to soothe him. She also failed to appear for a residential rehabilitation program after DFYS had arranged bed dates for her in

September 1999 and again in January 2000. Only in the month before trial—almost eight months after the birth of the twins—did S.M. enter a rehabilitation program. S.M. may have to remain in the program for up to two years, and her potential for successful completion of the program is uncertain. The court found that she has a high relapse potential. S.M. has other children who do not live with her and for whom she has been unable to care.

S.M. told DFYS that T.F. was the twins' father. Although T.F. initially questioned paternity, a blood test eventually proved him to be the twins' biological father. Like S.M., T.F. has a long-term problem with cocaine, although the court found that his addiction is less severe than hers. He also has another child, an eight-year-old daughter with whom he has lost contact. The trial court found that T.F. "has an extensive criminal record and has been unable throughout his adult life to remain clean and sober for any significant period of time," or to comply with rehabilitation efforts.

T.F.'s whereabouts were unknown at the time of the twins' birth, but in early August the DFYS intake supervisor learned that T.F. was incarcerated in the Fairbanks Correctional Center. The supervisor mailed T.F. a letter and preliminary case plan indicating that the department would arrange for paternity testing. The supervisor then transferred the case, including a plan for paternity testing for T.F., to a social worker. The social worker, Holly Byrnes, was unfamiliar with the testing process, had a family emergency at the time, and assumed that the incarcerated T.F. would easily be available for testing; it therefore took her somewhat longer than usual to arrange for a paternity test. DFYS filed a motion for the test on August 17, and the superior court ordered paternity testing; it distributed the order on September 9, 1999. The test was scheduled for October 13.

By the time the superior court issued the test order, however, T.F. had absconded from custody. Because S.M. told Byrnes that she was in contact with T.F., Byrnes gave S.M. information about T.F.'s scheduled testing appointment and explained that T.F. could participate in the test without risk of the authorities being notified. Although T.F. spoke to S.M. during this period, he did not appear for the test and did not contact DFYS.

T.F. returned to custody on November 7, 1999, a Sunday. However, Byrnes was already scheduled to depart the following morning for a month-long stint at the Nome DFYS office. She asked another DFYS representative in Fairbanks to set up the test, but learned upon her return to Fairbanks that no test had been arranged. Byrnes arranged for the test on her first day back in Fairbanks, on December 9, 1999. The test took place on December 28, but results were not available until February 29, 2000.

On January 11, 2000, while the test results were still pending, Byrnes visited T.F. in jail. They spoke for thirty or forty minutes about his case, but did not develop a substantive case plan. T.F. expressed an interest in involvement in the case if the children were his, but remained very doubtful that he was the father. Byrnes apparently next contacted T.F. in a March 1 letter, advising him that the twins were in fact his son and daughter. T.F. called and wrote to Byrnes to request visits with the babies, and his attorney called Byrnes on March 17 to arrange a meeting. Byrnes, T.F., and T.F.'s attorney met on March 28; apparently they would have met earlier but for the attorney's schedule. The three met for thirty minutes and prepared a case plan for T.F. They did not discuss classes and services available to T.F. in jail, although Byrnes did later contact the jail to learn which services T.F. had participated in, and to confirm that he had completed a substance abuse program. T.F. testified that, while incarcerated, he took a six-week parenting class and extra courses on fetal alcohol syndrome, and completed an eight to ten-week inmate alcohol and substance abuse program.

Byrnes also supervised three visits between T.F. and the twins, on March 23, March 30, and April 6, 2000; a fourth visit was canceled due to a DFYS scheduling problem. She initially worried about the twins' reactions to the unfamiliar environment of the jail and the presence of a strange

man, in light of their previous difficult visit with their mother. However, Byrnes ultimately concluded that the visits were positive.

The superior court held a trial on termination of parental rights on April 17–19, 2000. The parties stipulated to the existence of clear and convincing evidence that the children had been subjected to conditions sufficient to render them children in need of aid under AS 47.10.011(2)[1] and (10)[2] and that the parents, at the time of trial, had not remedied the conduct that placed the children at substantial risk of harm. The superior court terminated the rights of both parents. It found that the twins "have no ties with either biological parent" and expressed strong skepticism about the potential for either parent, particularly S.M., to become a sober and mature caregiver in the foreseeable future. But it emphasized that, even assuming the speediest possible recovery by the parents, the resulting delay in permanent placement would be "too long for the twins to wait." Because the twins urgently needed stable family placement, the court determined that termination of parental rights was in the best interests of the children. S.M. and T.F. now appeal.

## III. *STANDARD OF REVIEW*

■ In cases concerning the termination of parental rights, we will affirm the trial court's factual findings unless the findings are clearly erroneous.[3] Whether the factual findings are sufficient to satisfy the Child In Need of Aid (CINA) rules is a question of law, to which we apply our independent judgment.[4]

■ The question of whether the State has complied with the Indian Child Welfare Act's (ICWA's) "active efforts" requirement is a mixed question of law and fact.[5] The legal elements of this question, and any other purely legal questions, are reviewed* de novo.[6]

## IV. *DISCUSSION*

■ In order to terminate parental rights, a court must find by clear and convincing evidence that the children are in need of aid under AS 47.10.011, and that the parents have not remedied the conduct or conditions that place the children at substantial risk of harm.[7] The parties stipulated to these facts. Under ICWA, the court may not terminate parental rights to Indian children unless it finds by a preponderance of the evidence that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[8] In determining whether to terminate parental rights, "the court shall consider the best interests of the child."[9]

The parental rights of both S.M. and T.F. were terminated below, and both parents

1. Under AS 47.10.011(2), the court may find a child to be in need of aid if

   a. parent, guardian, or custodian is incarcerated, the other parent is absent or has committed conduct or created conditions that cause the child to be a child in need of aid under this chapter, and the incarcerated parent has not made adequate arrangements for the child.

2. Under AS 47.10.011(10), the court may find a child to be in need of aid if

   the parent, guardian, or custodian's ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant, and the addictive or habitual use of the intoxicant has resulted in a substantial risk of harm to the child; if a court has previously found that a child is a child in need of aid under this paragraph, the resumption of use of an intoxicant by a parent, guardian, or custodian within one year after rehabilitation is prima facie evidence that the ability to parent is substan-

tially impaired and the addictive or habitual use of the intoxicant has resulted in a substantial risk of harm to the child as described in this paragraph.

3. *See A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 259 (Alaska 1999).

4. *See D.H. v. State*, 929 P.2d 650, 654 n. 11 (Alaska 1996).

5. *See A.A.*, 982 P.2d at 259.

6. *See id.*

7. *See* AS 47.10.088(a)(1)(A)-(B)(i).

8. 25 U.S.C. § 1912(d) (1983).

9. AS 47.10.088(c).

separately challenge the termination. We will consider their arguments in turn.

### A. The Superior Court Did Not Err in Terminating S.M.'s Parental Rights.

■ S.M. argues that DFYS and the trial court did not allow her sufficient time before the trial to prove her fitness as a parent. The legal foundation of her argument is unclear.[10]

But as the State correctly argues, the AS 47.10.088 factors for termination of parental rights govern and refute S.M.'s claim. Under the statute, a court may terminate parental rights if it finds by clear and convincing evidence that a parent "has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury."[11] For purposes of this determination, courts may consider any fact relating to the best interests of the child, including:

(1) The likelihood of returning the child to the parent within a reasonable time based on the child's age or needs;

(2) the amount of effort made by the parent to remedy the conduct . . .;

. . . .

(4) the likelihood that the harmful conduct will continue; and

(5) the history of conduct by or conditions created by the parent.[12]

The superior court's decision is legally supported under all of these factors. Termination of S.M.'s rights under factor (1) is supported by the court's finding that "to put off [termination of rights] or to provide [S.M. with] more time to deal with [her] personal issues would be detrimental to the welfare and best interest[s] of the children," because "[t]he children need a permanent placement as soon as reasonably possible." Given this finding, it appears not only unlikely but impossible that the children could be "return[ed] . . . to the parent within a reasonable time based on [their] age or needs."[13]

Following the superior court's findings, termination is also appropriate under AS 47.10.088(b) factors (5), (4), and (2). The court noted S.M.'s serious history of conduct that could be damaging to a child—factor (5)—and the high likelihood that this conduct would continue in the future—factor (4). It also found that "Ms. [M.] made little effort to visit the twins since their birth," but instead was "difficult for the social workers to locate" and "continued to abuse drugs and pursue her nomadic and chaotic lifestyle." Despite S.M.'s seemingly sincere efforts toward recovery in the weeks before trial, in light of her forgone opportunities to remedy her conduct in the preceding seven months, the superior court did not err in concluding that the "amount of effort made by the parent to remedy the conduct" was insufficient under AS 47.10.088(b)(2). We therefore affirm termination of S.M.'s parental rights.

### B. The Superior Court Did Not Err in Terminating T.F.'s Parental Rights.

■ T.F. argues that the superior court wrongly terminated his parental rights because it erred both in finding that DFYS had made an active effort to prevent family break-up and in finding that T.F.'s continued custody was likely to damage the children. We are sympathetic to T.F.'s position, given the short period of time in which his paternity was certain and he was able to work on a case plan with DFYS.

We in no way condone DFYS's contribution to the delay in paternity testing. However, we note that T.F. himself bears substantial responsibility for the delay. DFYS filed a motion for paternity testing within thirty days of the twins' birth; T.F. did not respond to that motion. Instead, he absconded from state custody before the test

---

10. S.M. maintains "[t]he law to be applied has no case law or statutory law as an origin. One might say that everybody involved stipulated to a law of the case that was as yet undeclared in Alaska law." Although we have reviewed the stipulations, it is unclear to us what argument is being made. She cites no law in her argument.

11. AS 47.10.088(a)(1)(B)(ii).

12. AS 47.10.088(b).

13. AS 47.10.088(b)(1).

could be scheduled—an action which, despite the dissent's reference to being "away without leave,"[14] probably constituted criminal escape or unlawful evasion under AS 11.56.300–.340. When T.F. did return to custody, the DFYS worker assigned to his case only learned of his return by reading the police blotter; there is no indication that he sought to contact DFYS.

If T.F. had not absconded from custody, or if he had contacted DFYS during his almost three months of unauthorized absence, testing could have been completed at a far earlier date and DFYS's active efforts to reunify T.F. with his children could have commenced further in advance of the scheduled termination proceedings. As a result of T.F.'s untimely disappearance, however, T.F.'s paternity was ascertained—and DFYS's active efforts obligation triggered—only six weeks before termination proceedings.

One can imagine situations in which it would be unfair to deny a biological father a longer period of time to demonstrate his fitness as a parent. The dissent argues that this is the case on the facts now before us, and that given the short period of reunification efforts DFYS cannot be considered to have made unsuccessful active efforts to reunite T.F. and the twins. But the rule apparently supported by the dissent would allow putative fathers to avoid both testing and engagement with their children until the eve of trial, then trigger a new and potentially lengthy round of DFYS active efforts obligations by confirming paternity. The resulting delay would not be in the best interests of young children who need permanent placement. On the facts of this case, given T.F.'s role in postponing paternity testing, his incarceration and resulting unavailability to care for the twins in their formative early

years, and the likelihood that he would not be able to provide a stable home life to these special needs children even when he is released from incarceration, such a delay would not be justified. Given the particular facts of this case, we find that the totality of the circumstances supports the superior court's decision to terminate T.F.'s rights. We considered very similar questions in *A.A. v. State*;[15] our decision today in large part draws on our decision in that case.

### 1. DFYS made active efforts to prevent the family's breakup.

■ Under ICWA, a court may only terminate parental rights if it finds by a preponderance of the evidence that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[16] T.F. argues that the superior court erred in finding that DFYS met the active efforts requirement.[17]

The degree of active efforts required of DFYS is reduced by two factors: the initial uncertainty of T.F.'s paternity and T.F.'s incarceration. The superior court recognized these factors, finding that "given Mr. [F.]'s incarceration and his initial concern about his paternity, there was little more the Department could have reasonably provided Mr. [F.] beyond that which was available in the jail."

### a. Uncertain paternity

■ Under ICWA rules and our decision in *A.A. v. State*, the State did not owe T.F. active efforts until paternity was estab-

---

**14.** Dissent at 1098.

**15.** 982 P.2d 256 (Alaska 1999).

**16.** 25 U.S.C. § 1912(d) (1983); *see also N.A. v. State*, 19 P.3d 597, 602 (Alaska 2001).

**17.** T.F. also claims that "[t]he court made no findings at all as to what efforts had been made to prevent the breakup of the family in this case." The record does not support this claim. The superior court found that "[t]he State has made reasonable and active efforts to work with both

parents to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family...." It specifically noted that DFYS contacted S.M. in the hospital, scheduled visitation with both parents, and arranged for two paternity tests, and that the State enrolled S.M. in a drug treatment program. Although the court does not in its findings discuss T.F.'s classes in jail, the court heard testimony about his enrollment and concluded that there was little more that DFYS could reasonably have done while T.F. was in jail.

lished.[18] In *A.A.*, we affirmed the termination of a biological father's parental rights.[19] In that case, the father had denied paternity and requested a blood test.[20] DFYS initiated termination proceedings before the test was completed,[21] and never developed a case plan for the father.[22] Our decision drew on the statutory language of ICWA, which explicitly defines the parents protected by the statute as "not includ[ing] the unwed father where paternity has not been acknowledged or established."[23] We concluded that "because A.A. did not acknowledge paternity before the blood test, ICWA did not obligate the State to provide [active] efforts until A.A.'s paternity had been established."[24]

Like A.A., T.F. did not acknowledge paternity prior to his blood test. Following *A.A.*, DFYS therefore had no duty to undertake active efforts during the time between the birth of the twins and the February 28 determination of paternity.

The dissent argues that T.F.'s failure to appear for paternity testing cannot have "discharged the State from its duty to take further active family unification efforts."[25] But until paternity was established, the State *had* no active efforts duty. In *A.A.*, we answered in the negative the question "whether DFYS's delay in determining paternity can violate the 'active efforts' requirement"; the dissent offers no grounds for departing from this precedent. Moreover, T.F. was passive at best, and resistant at worst, in the face of DFYS's attempt to determine paternity. His actions were a ma-jor cause of delay in completing the tests. As the superior court noted:

> It is true that paternity testing could have been expedited once Mr. [F.] was back in custody and Mr. [F.]'s case plan and visitation at the jail [could have] started earlier. However, had Mr. [F.] not been on abscond status, the entire issue could have been resolved earlier.

The dissent further suggests that DFYS's and the superior court's choice to proceed with termination proceedings in the face of T.F.'s non-cooperation was a " 'one strike and you're out' approach to reunification services."[26] The analogy to criminal law is misplaced; adherence to *A.A.*'s rule regarding paternity testing is not a punitive measure against T.F. Rather, it is driven by the policy of protecting children in need of aid. The superior court appropriately determined that "custody by either [parent] is likely to result in serious emotional or physical damage to the children" and that further instability and delay in finding a permanent home would be "detrimental to the welfare and best interest[s] of the children."

### b. *T.F.'s incarceration and subsequent absconding status*

Once DFYS determined that T.F. was the father, its active efforts duties were triggered.[27] Even then, however, the scope of the State's duties was reduced by T.F.'s incarceration. Because of this reduction, DFYS's efforts in the weeks after the confirmation of T.F.'s paternity met the active efforts requirement.[28]

---

18. 982 P.2d 256 (Alaska 1999).

19. *See id.* at 258.

20. *See id.*

21. *See id.* at 258–59.

22. *See id.* at 262.

23. *Id.* at 261–62; 25 U.S.C. § 1903(9).

24. 982 P.2d at 262.

25. Dissent at 1099.

26. Dissent at 1099.

27. *See A.A.*, 982 P.2d at 262.

28. The superior court found that "The State has made reasonable and active efforts to work with both parents to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family...." Efforts made with respect to T.F. included scheduling two paternity tests, attempting to contact him through S.M., a letter to his last known address, and a fax to his previous attorney while T.F. was on abscond status, conducting three visitations between T.F. and the twins, contacting his probation officer to ensure that he was enrolled in the appropriate classes in jail, and meeting with him once before the paternity test and once after to discuss his case-although a formal case plan for T.F. was not finalized until the second meeting, on March 28, 2000.

We held in *A.A.* that "[a] parent's incarceration significantly affects the scope of the active efforts that the State must make."[29] While incarceration does not relieve the State of its duties, the practical circumstances of incarceration may reduce the possible options available to the State.[30] Moreover, because ICWA requires the *State*, rather than a particular agency, to make "active efforts ... to provide remedial services and rehabilitative programs,"[31] we have held that the Department of Corrections, rather than DFYS, may fulfill this obligation by enrolling the parent in classes and treatment programs[32]—as the Department of Corrections did in this case. Given this standard, the State's efforts were sufficient.

2. *Under the totality of circumstances in this case, the superior court did not err in determining that custody in the father would be likely to damage the twins.*

T.F. argues that the superior court erred in finding that continued custody by T.F. is likely to cause serious emotional or physical damage to the children. Because of the delay in placement, T.F.'s incarceration, and other factors, we conclude that the superior court did not err in finding that continued custody by T.F. is likely to cause the children serious emotional harm or physical damage.

The superior court's decision to terminate depended in part on its finding that delay in permanent placement would harm the twins. Although T.F. challenges the evidentiary sufficiency of this finding, it was supported by expert testimony before the superior court.

Alaska Statute 47.10.080(*o*) provides that a parent's incarceration may support termination of parental rights if the court finds, based on clear and convincing evidence, that

(1) the period of incarceration that the parent is scheduled to serve during the child's minority is significant considering the child's age and the child's need for an adult's care and supervision;

(2) there is not another parent willing and able to care for the child; and

(3) the incarcerated parent has failed to make adequate provisions for care of the child during the period of incarceration that will be during the child's minority.

The superior court found each of the statutory factors: It found that the delay caused by T.F.'s incarceration was significant "considering the children's age and their current needs"; it found that the children's mother was currently unable to care for them; and it found that "Mr. [F.] has not taken steps to have alternative care provided for the children during his period of unavailability...." T.F. does not discuss the statute or dispute its applicability in his appeal to this court.

In this case, numerous factors combine with the concern about parental incarceration and placement delay to convince us that termination was appropriate. First, the superior court found that T.F. had a high relapse potential; such potential diminishes the likelihood that T.F. could be a stable custodian for his children after his release from incarceration. Second, the twins are children with special needs, with a particularly great need for attentive and capable parenting. Third, T.F. already has another child but has been unable to care for her "due to [his] addiction[ ] and lifestyle[ ]." Finally, T.F.'s interest in the twins was contingent on confirmation that he was the father, but this interest was weak enough that T.F. chose to abscond from custody rather than participating in paternity testing. T.F.'s own actions prevented him from determining paternity and assuming any active interest in the twins

**29.** *Id.* at 261.

**30.** *See id.; see also In re Riva M.*, 235 Cal. App.3d 403, 413–14, 286 Cal.Rptr. 592 (1991) (terminating father's rights in ICWA case based in part on his incarceration and rejecting a claim that the state failed to meet the active efforts requirement, noting that "it is nonsense to argue Lorenzo was not offered adequate reu-

nification services" despite fact that during period of incarceration he was "not made a major part" of the reunification plan).

**31.** 25 U.S.C. § 1912(d).

**32.** *See A.M. v. State*, 945 P.2d 296, 305 (Alaska 1997); *see also A.A.*, 982 P.2d at 263.

until they were over seven months old. Given these facts, in conjunction with the instability which T.F.'s incarceration would bring to these young children, we conclude that the superior court did not err in terminating T.F.'s parental rights.

## V. *CONCLUSION*

Because termination of S.M.'s parental rights is squarely supported by the governing statute, we AFFIRM the termination of her rights. In light of the totality of the circumstances, we also AFFIRM the termination of T.F.'s rights. Our ruling is narrowly based on the facts of this case.

MATTHEWS, Justice, with whom BRYNER, Justice, joins, dissenting.

The trial court did not find that active efforts to preserve T.F.'s family relationship with the children had proved to be unsuccessful. Further, if such a finding had been made, it would not have been supported by the record. Because subsection 1912(d) of ICWA requires a showing that active efforts "have proved unsuccessful," and as to T.F. such a showing was neither found nor made, I dissent.

### I.

The State's ICWA-imposed duty to provide active family-saving efforts to T.F. was not triggered until February 29, 2000. At that point a paternity test demonstrated that he was the father of the children. When the test results were received the termination trial was scheduled to take place in six weeks. That schedule was never altered. What active efforts did the State make with respect to T.F.?

What DFYS did was to formulate a case plan and arrange three visits between T.F. and the children. The case plan itself does not qualify as a family uniting effort because the stated objective of the plan was adoption.

The three visits were initiated by T.F. When he called the DFYS social worker to request the visits she attempted to dissuade him. Ultimately, however, she relented and the visits took place. T.F. also availed himself of a number of prison-operated programs. These included a parenting class, a class on fetal alcohol consequences, substance abuse treatment, and group therapy sessions. These programs can be considered active efforts that might satisfy ICWA.[1]

The prison programs and the three visits arranged by DFYS were a good start toward compliance with ICWA's active efforts requirement. But they had no real chance of success at uniting T.F. with his children because they were cut short by the termination decree.

As noted, ICWA requires that before there can be a termination of parental rights the active efforts that have been made must prove to be unsuccessful.[2] The trial court made no finding as to T.F. that the efforts had proved unsuccessful. The closest the court came was to find that "the department . . . did not receive cooperation from the parties." The lack of cooperation finding was directed only at T.F.'s failure to take the paternity test scheduled for October 13. The court did not find that T.F. was uncooperative with respect to any of the efforts that were taken after the test established his paternity. More to the point, for ICWA purposes, the court did not find that any of these efforts had proved unsuccessful. If these efforts are to be counted as meeting the "active efforts" requirement of subsection 1912(d) of ICWA, they must ultimately be unsuccessful.

My reading of the record indicates that once T.F.'s paternity was established he showed no lack of willingness to participate in the prison rehabilitation programs and took the initiative to arrange visits with his children. The record does not show either

1. *See A.M. v. State*, 945 P.2d 296, 305 (Alaska 1997).

2. *See* 25 U.S.C. § 1912(d) (1983):

Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

that the visits or T.F.'s participation in the prisoner programs were unsuccessful.

In *K.N. v. State*, we addressed the burden of proof required under subsection 1912(d), holding that the State was required to show by a preponderance of the evidence that it had made active efforts to prevent the breakup of the family and that those efforts had been unsuccessful.[3] In that case, we approved as active and unsuccessful the State's efforts to provide services to the father, finding that his refusal to work with DFYS, his denial of his mental problems, and his recalcitrant attitude toward treatment demonstrated that the State's efforts had been unsuccessful.[4] The present case does not present analogous facts, as there was no showing regarding the failure of the State's efforts with regard to T.F. Other states interpreting ICWA have required an affirmative showing by the state that its efforts have been unsuccessful.[5]

In 1998 the legislature mandated strict and short time schedules for filing termination petitions and holding termination trials.[6] Acting in response to this new mandate, DFYS and the trial court put this termination proceeding on a fast track. After T.F. was determined to be the father of the children, the active efforts to unite him with his children were unsuccessful because they were necessarily ended by the termination decree. But under ICWA lack of success is a precondition to termination. Termination cannot serve as the reason why active efforts fail to succeed. It should go without saying based on the supremacy clause of the federal constitution [7] that the requirements of ICWA must be observed even if that means some slippage in the state statutory scheduling requirements.

## II.

The main point of this dissent is that since subsection 1912(d) of ICWA imposes a duty to take active reuniting efforts and provides that those active efforts that satisfy this duty must have proved unsuccessful, this means that time must be allowed for active reuniting efforts to either fail or succeed. Reuniting efforts, such as the Department of Corrections programs in this case, that have not been given sufficient time to fail or succeed do not satisfy subsection 1912(d). In this case the only active reuniting effort that failed was distinctly preliminary in character; it was the effort to set up a paternity test for T.F. that was scheduled to take place on October 13, 1999. As of that date T.F. was away without leave from the halfway house where he was incarcerated and thus missed the test. Since this is the only active effort that proved unsuccessful, the real issue in this case is whether T.F.'s failure to show up for the October 13 test discharged the State from any further duty to take active efforts to unite T.F. with his children.

My view on this question is that under the circumstances of this case T.F.'s failure to take the test on October 13 did not discharge the State from its duty to take further active efforts under subsection 1912(d). The time frame of the events in this case is very compressed. The children were born on July 22, 1999, and within nine months thereafter the parental rights of both parents were terminated. The State delayed in arranging paternity tests before the October 13 date. Further, although T.F. was AWOL on October 13, he was back in custody as of November 7, 1999,[8] yet the State delayed for another seven weeks in taking a saliva sample

---

**3.** 856 P.2d 468, 476 (Alaska 1993).

**4.** *Id.*

**5.** *See, e.g., State ex rel. Juvenile Dep't of Multnomah County v. Charles*, 70 Or.App. 10, 688 P.2d 1354, 1359 (1984) ("the state must show that the efforts have been made but have not worked"); *In re Dependency of A.M.*, 106 Wash.App. 123, 22 P.3d 828, 834 (Wa.App.2001) ("failure [of state efforts] must be shown before parental rights to an Indian child may be terminated"); *In Interest of M.S.*, 624 N.W.2d 678, 684 (N.D.2001) (affirming termination order where active efforts to

provide remedial services and rehabilitative programs were undertaken and proved unsuccessful); *In re E.M, A.M., and J.M.*, 466 N.W.2d 168, 173–74 (S.D.1991) (finding § 1912(d) satisfied where court made detailed findings regarding provision of services and failure by parent).

**6.** *See* AS 47.10.088.

**7.** *See* U.S. Const. art. VI.

**8.** Far from being the "eve of trial," *see* Slip Op. at 1094, the Petition for Termination of Parental Rights was not even filed at this point.

from him for DNA testing purposes. Overall, it appears that T.F.'s AWOL directly caused a three-week delay, whereas the State bears the responsibility for failing to take a saliva sample earlier, and a heavy share of the responsibility for the delay after November 7 until December 28, when T.F.'s saliva was finally taken.

The underlying idea of subsection 1912(d) is that troubled and situationally unfit parents should receive rehabilitative services so that they may be able to fulfill traditional parental roles. In the process of receiving rehabilitative services some false starts and setbacks are to be expected. Treating one missed appointment for testing as a discharge of subsection 1912(d)'s active efforts duty seems inconsistent with the remedial purposes of subsection 1912(d). I do not believe that a "one strike and you're out" approach to reunification services is what Congress had in mind in enacting ICWA. Thus I do not believe that the missed October appointment can be said to have discharged the State from its duty to take further active family unification efforts. And since, as noted above, those further efforts that were taken did not prove unsuccessful, the requirements of subsection 1912(d) of ICWA, in my view, have not been satisfied.

For the above reasons I would reverse the termination decree as to T.F. and remand for further proceedings so that the requirements of subsection 1912(d) of ICWA can be satisfied.