NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite a memorandum decision in a brief or at oral argument should review Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| LARRY T., | ) | |
| | ) | Supreme Court No. S-15157 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-11-00028 CN |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| STATE OF ALASKA, DEPARTMENT | ) | AND JUDGMENT* |
| OF HEALTH & SOCIAL SERVICES, | ) | |
| OFFICE OF CHILDREN'S SERVICES, | ) | No. 1507 - July 2, 2014 |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Catherine M. Easter, Judge.

Appearances: Olena Kalytiak Davis, Anchorage, for Appellant. David T. Jones, Senior Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

I.     INTRODUCTION

Larry T. is the father of Kevin, and has been incarcerated most of Kevin's

---

\*      Entered under Alaska Appellate Rule 214.

life.[1] Kevin is an "Indian child" under the Indian Child Welfare Act of 1978 (ICWA).[2] Kevin's mother agreed to his adoption by her mother; the superior court later terminated Larry's parental rights, and he appealed pro se. After briefing was complete, Larry requested the appointment of counsel to represent him in the appeal. Counsel was appointed and requested an opportunity to re-brief the appeal; we granted that request. We limit our consideration to the new briefing, in which Larry contends the superior court erred by determining that Kevin was a child in need of aid, that the State of Alaska, Department of Health & Social Services, Office of Children's Services (OCS) made active efforts to avoid the breakup of the Indian family, and that it was in Kevin's best interests to terminate Larry's parental rights.

---

[1]     We use pseudonyms for family members out of privacy considerations.

[2]     *See* 25 U.S.C. § 1903(4) (2006). ICWA establishes "minimum Federal standards for the removal of Indian children from their families and [for] the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." *Id.* at § 1902.

Under Alaska Child in Need of Aid Rule 18 parental rights to an Indian child may be terminated at trial only if the court finds:

(1) by clear and convincing evidence that: (a) the child has been subjected to conduct or conditions enumerated in AS 47.10.011; (b) the parent has not remedied the conduct or conditions that place the child at substantial risk of harm or has failed within a reasonable time to remedy the conduct or conditions so that the child would be at substantial risk of physical or mental injury if returned to the parent; and (c) active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family;

(2) beyond a reasonable doubt, including qualified expert testimony, that continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child; and

(3) by a preponderance of the evidence that the child's best interests would be served by termination of parental rights.

We affirm the superior court's findings and its termination of Larry's parental rights.[3]

## II.    FACTS AND PROCEEDINGS

OCS first became involved in Kevin's life in late 2010, when he was about one year old. Kevin's mother, Joy, was not providing him appropriate care and she tested positive for methamphetamine. OCS filed an emergency custody petition in January 2011, and Kevin was placed with Joy's mother, Evita. In April 2011 Joy stipulated that Kevin was a child in need of aid under AS 47.10.011(9) and (10), relating to neglect and drug or alcohol use by a parent.

About this time Larry, who was incarcerated, learned that he was Kevin's father. Larry was released shortly thereafter, but was arrested again in June. In July he was incarcerated on other charges pending a criminal trial that had been postponed 24 times by the time of the termination trial. According to Larry's testimony at the termination trial, if convicted of the criminal charges he could be sentenced for up to 99 years in prison.

---

[3]    Whether a child is in need of aid is a factual determination. *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 428 (Alaska 2012) (citing *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 270 (Alaska 2011)). Whether OCS made active, but unsuccessful, efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family is a mixed question of fact and law. *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1104 (Alaska 2011) (citing *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1018 (Alaska 2009)). Best interests determinations are factual findings reviewed for clear error. *Sherman B.*, 290 P.3d at 428 (citing *Christina J.*, 254 P.3d at 1104). We will affirm factual findings that are not clearly erroneous. *Christina J.*, 254 P.3d at 1103 (citing *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1267 (Alaska 2008)). We review legal questions de novo. *Id*. at 1104 (citing *Ben M.*, 204 P.3d at 1018).

Larry testified that during his incarceration he sometimes was in segregation and maximum segregation. One reason he was put into segregation was for smashing a typewriter; he testified that he smashed the typewriter in the law library. He estimated that about half of his time was in "open population," the jail's general population.

After Larry's return to jail, his OCS case plans included having visits with Kevin at the jail, undergoing a mental health evaluation, completing a substance abuse assessment, and completing an intake for the Father's Journey program. Because Larry was incarcerated and often in segregation, he was unable to complete any goal except visiting with Kevin.

In June 2012 OCS moved to terminate Larry's parental rights and in September Joy consented to Evita's adoption of Kevin. Evita, like Joy and Kevin, is Inupiaq, so placement with Evita is highly preferred under ICWA;[4] their tribe, Native Village of Kotzebue, fully supported that placement. There was substantial trial testimony that Kevin was doing well living with Evita. Kevin was described as a "happy little guy." Evita was teaching Kevin about their culture and taking him to a Native dance group. The clinical psychologist who evaluated Kevin and his relationships found that Kevin saw Evita as his mother and was "thriving." The psychologist testified that Kevin knew Larry was "dad" but interacted with him as a "familiar playmate."

Trial was held in April 2013. The superior court found that: (1) by clear and convincing evidence, Kevin was a child in need of aid under AS 47.10.011(1) and (2) (abandonment and incarceration); (2) by clear and convincing evidence, Larry did

---

[4]     25 U.S.C. § 1915(a) provides: "In any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families."

not remedy the conduct that put Kevin at risk for substantial harm; (3) by clear and convincing evidence, OCS made active efforts to prevent the breakup of the family; (4) beyond a reasonable doubt, "continued custody of the child by [Larry] is likely to result in serious emotional or physical damage to the child"; and (5) by a preponderance of the evidence, it was in Kevin's best interests to terminate Larry's parental rights.

Larry appeals three of these findings, arguing that: (1) Kevin was not a child in need of aid; (2) OCS failed to make active efforts; and (3) termination of Larry's parental rights was not in Kevin's best interests. Although Kevin's mother, the guardian ad litem, and Native Village of Kotzebue were involved in the superior court proceedings, they have not participated in the appeal.

## III. DISCUSSION

### A. The Superior Court Did Not Err By Finding Kevin A Child In Need Of Aid.

The superior court found that Kevin is a child in need of aid based on abandonment and incarceration.[5] Only one statutory basis is required to find a child in need of aid,[6] and we affirm the superior court's finding based on incarceration.

Alaska Statute 47.10.011(2) provides that a court may find a child to be in need of aid if "a parent, guardian, or custodian is incarcerated, the other parent is absent or has committed conduct or created conditions that cause the child to be a child in need of aid under this chapter, and the incarcerated parent has not made adequate arrangements for the child."[7] Larry argues only that he did make adequate provisions for

---

[5] AS 47.10.011(1)-(2).

[6] *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 762 (Alaska 2009).

[7] The superior court also found Kevin to be in need of aid under
(continued...)

Kevin's care, and that the superior court therefore erred in finding that Kevin was a child in need of aid.

Larry did not know he was Kevin's father until after OCS took custody of Kevin, and therefore could not be expected to "make adequate provisions" for Kevin before that time. Although Larry later suggested his sister, his girlfriend, or his mother and stepfather as possible placements, the court ultimately found these placements were unsuitable. Larry's girlfriend is not biologically related to Kevin; there also was testimony that the girlfriend did not have a stable place to live and resided in a hotel, a tent, on the streets, or in a women's shelter. Larry's sister told OCS that she did not want to adopt Kevin. Larry's mother was worried about Kevin but did not want to adopt him, and at trial she testified that she would take Kevin "if there was nobody else available" but that it was more proper for him to live with Evita. She said, "I'm . . . 53 years old, I'm in the middle of Kansas, I don't know that much about little Eskimo children . . . I wouldn't say that I would be the best choice by any means."

Larry argues that out of these three options, placing Kevin with Larry's mother was at least "facially adequate."[8] But without regard to whether his suggested arrangement was *facially* adequate, the evidence at trial demonstrates that it was not *actually* adequate. The superior court did not clearly err when it found by clear and convincing evidence that Larry did not make adequate provisions for Kevin's care during Larry's incarceration.

---

[7]     (...continued)
AS 47.10.080(o), but we do not need to address that finding because we uphold the finding under AS 47.10.011(2).

[8]     *Cf. Stanley B. v. State, DFYS*, 93 P.3d 403, 406 (Alaska 2004) (holding conditions for termination were met when no placement options were facially adequate).

**B.      The Superior Court Did Not Err When It Found That OCS Made Active Efforts To Prevent The Breakup Of The Family.**

ICWA requires OCS to establish, by clear and convincing evidence, that it made "active efforts" to prevent the breakup of a family.[9]  This court has cited with approval one commenter's explanation that "[p]assive efforts are where a plan is drawn up and the client must develop his or her own resources towards bringing it to fruition. Active efforts . . . [are] where the state caseworker takes the client through the steps of the plan rather than requiring that the plan be performed on its own."[10]

Larry's arguments here relate only to whether OCS made active efforts to assist him to participate in his case plans.  This goes to whether Larry could remedy the finding that Kevin was a child in need of aid because of Larry's abandonment.  As we have affirmed the superior court's finding that Kevin is a child in need of aid based on Larry's incarceration and failure to make adequate provisions for Kevin's care, we do not need to reach the abandonment issue.  Larry does not assert that OCS failed in any way to investigate or consider his suggested placements for Kevin after Larry learned he was Kevin's father and became involved in the proceedings, or that OCS otherwise failed to actively assist Larry in making adequate provisions for Kevin's care.

We note, however, that the superior court made numerous factual findings supporting its determination that OCS had made active efforts to prevent the breakup of the family due to Larry's abandonment through failure to participate in case plans.  The court found that before Larry was incarcerated, OCS got him a bus pass and tried to get him into substance abuse treatment.  While Larry was incarcerated, OCS sent him

---

[9]      25 U.S.C. § 1912(d); *Gilbert M. v. State*, 139 P.3d 581, 590 (Alaska 2006).

[10]      CRAIG J. DORSAY, THE INDIAN CHILD WELFARE ACT AND LAWS AFFECTING INDIAN JUVENILES MANUAL, 157-58 (1984), *quoted with approval in A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999).

monthly letters encouraging him to participate in the available educational offerings such as the GED program, parenting classes, Alcoholics Anonymous, and Narcotics Anonymous. For the most part, Larry does not dispute the court's factual findings, but rather contends that OCS failed to properly guide him through his case plans.

For incarcerated parents, "an analysis of the state's active efforts is not limited to efforts by OCS; programs offered by the Department of Corrections are also considered part of the state's efforts."[11] Here, many Department of Corrections programs were not available to Larry because he was in segregation for poor behavior, such as when he smashed a typewriter in the jail library. Nevertheless, prior to termination, OCS brought Kevin to the jail for weekly visits with Larry.

We therefore conclude that the superior court did not err in determining that OCS made active efforts in this case.

### C. The Superior Court Did Not Err When Determining Termination Of Larry's Parental Rights Was In Kevin's Best Interests.

In making a best interests determination, the superior court:

may consider any fact relating to the bests interest of the child, including

(1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs;

(2) the amount of effort by the parent to remedy the conduct or the conditions in the home;

(3) the harm caused to the child;

---

[11]     *Dashiell R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 222 P.3d 841, 849 (Alaska 2009) (citing *Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 77 P.3d 715, 720–21 (Alaska 2003); *T.F. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 26 P.3d 1089, 1096 (Alaska 2001)).

(4) the likelihood that the harmful conduct will continue; and

(5) the history of conduct by or conditions created by the parent.[12]

In this analysis, "it is the best interests of the child, not the parent, that are paramount."[13]

In making its best interests determination, the superior court stated that the clinical psychologist testified "removing the child from [Evita] would disrupt the parent-child bond between them and by disrupting that attachment relationship, the child would be at risk for developing a range of mental health disorders, including attachment disorders, depression, and anxiety." The court agreed with the psychologist's testimony that Kevin had a parent-child bond with Evita but not with Larry.

This finding was based on the psychologist's testimony that Kevin does not view Larry "as a parental figure but as someone he visits and he plays with." The psychologist testified that she did not want to discount Kevin losing Larry, but "the loss of the . . . visits at this point in time would be relatively insignificant, [like] losing sort of a familiar playmate." The psychologist also stated that she had not seen anything in Larry's interactions with Kevin more serious than "minor concerns." But when she was asked how a child would be affected by having continued visitation with a parent who was often in segregation and maximum segregation, she responded that:

> it is really difficult for children to maintain contact that's psychologically helpful and . . . healthy for the child if the contact is not predictable. And so someone for whom the contact becomes unpredictable, canceled, rescheduled, or

---

**12**    AS 47.10.088(b); *see also Barbara P. v. State, Dep't of Health & Soc. Servs.*, 234 P.3d 1245, 1263 (Alaska 2010).

**13**    *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 274 (Alaska 2011) (citing *Tessa M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 182 P.3d 1110, 1116 (Alaska 2008)).

occurs in different ways because the parent is in segregation or has to be shackled or has to use only the non-contact kind of visits, I think that's really tough on children . . . .

We previously have upheld termination of parental rights when the children in question have bonded with their foster families and did not "have any real sense of their parents as parents."[14] We have emphasized the child's need for permanency.[15] One of Congress's goals for ICWA is to promote stability in Indian families[16] and we have long recognized that permanency is in a child's best interests.[17] The testimony that Kevin sees Evita as a parent and Larry as a familiar playmate supports the conclusion that termination of Larry's parental rights will further Kevin's ability to have a stable home with Evita.

Based on this evidence, the superior court did not clearly err in finding that it was in Kevin's best interests to terminate Larry's parental rights.[18]

## IV. CONCLUSION

We AFFIRM the superior court's termination of parental rights.

---

[14] *Barbara P.*, 234 P.3d at 1263-64.

[15] *Id.* at 1263.

[16] 25 U.S.C. § 1902.

[17] *See, e.g.*, *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 768 (Alaska 2009) (Christen, J., dissenting in part).

[18] Larry also argues that the court erred by not considering whether a guardianship by Evita would have been in Kevin's best interests, so that Larry could still have contact with Kevin. But we have held that the statute "does not require that guardianship be considered in termination proceedings, except to the extent that the statute requires the court to order an arrangement that is in the child's best interests." *C.W. v. State*, 23 P.3d 52, 57 (Alaska 2001).